# EASTERN RAILROAD PRESIDENTS CONFERENCE ET AL. *v.* NOERR MOTOR FREIGHT, INC., ET AL.

No. 50.  Argued December 12–13, 1960.—Decided February 20, 1961.

*Philip Price* and *Hugh B. Cox* argued the cause for petitioners. With them on the briefs were *C. Brewster Rhoads, Gerald E. Dwyer, Arthur Littleton, Henry S. Drinker, Charles J. Biddle, Harry E. Sprogell, Lewis M. Stevens, T. W. Pomeroy, Jr., Paul Maloney, Carl E. Glock, R. Sturgis Ingersoll, Powell Pierpoint* and *Cornelius C. O'Brien, Jr.*

*Harold E. Kohn* argued the cause for respondents. With him on the brief was *Aaron M. Fine.*

MR. JUSTICE BLACK delivered the opinion of the Court.

American railroads have always largely depended upon income from the long-distance transportation of heavy freight for economic survival. During the early years of their existence, they had virtually no competition in this aspect of their business, but, as early as the 1920's, the growth of the trucking industry in this country began to bring about changes in this situation. For the truckers found, just as the railroads had learned earlier, that a very profitable part of the transportation business was the long hauling of heavy freight. As the trucking industry became more and more powerful, the competition between it and the railroads for this business became increasingly intense until, during the period following the conclusion of World War II, at least the railroads, if not both of the competing groups, came to view the struggle

as one of economic life or death for their method of transportation. The present litigation is an outgrowth of one part of that struggle.

The case was commenced by a complaint filed in the United States District Court in Pennsylvania on behalf of 41 Pennsylvania truck operators and their trade association, the Pennsylvania Motor Truck Association. This complaint, which named as defendants 24 Eastern railroads, an association of the presidents of those railroads known as the Eastern Railroad Presidents Conference, and a public relations firm, Carl Byoir & Associates, Inc., charged that the defendants had conspired to restrain trade in and monopolize the long-distance freight business in violation of §§ 1[1] and 2[2] of the Sherman Act. The gist of the conspiracy alleged was that the railroads had engaged Byoir to conduct a publicity campaign against the truckers designed to foster the adoption and retention of laws and law enforcement practices destructive of the trucking business, to create an atmosphere of distaste for the truckers among the general public, and to impair the relationships existing between the truckers and their customers. The campaign so conducted was described in the complaint as "vicious, corrupt, and fraudulent," first, in that the sole motivation behind it was the desire on the part of the railroads to injure the truckers and eventually to destroy them as competitors in the long-distance freight business, and, secondly, in that the defendants utilized the

---

[1] "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . ." 15 U. S. C. § 1.

[2] "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a misdemeanor . . . ." 15 U. S. C. § 2.

so-called third-party technique, that is, the publicity matter circulated in the campaign was made to appear as spontaneously expressed views of independent persons and civic groups when, in fact, it was largely prepared and produced by Byoir and paid for by the railroads.[3]   The complaint then went on to supplement these more or less general allegations with specific charges as to particular instances in which the railroads had attempted to influence legislation by means of their publicity campaign. One of several such charges was that the defendants had succeeded in persuading the Governor of Pennsylvania to veto a measure known as the "Fair Truck Bill," [4] which would have permitted truckers to carry heavier loads over Pennsylvania roads.

The prayer of the complaint was for treble damages under § 4 of the Clayton Act [5] and an injunction restraining the defendants from further acts in pursuance of the conspiracy.   Insofar as the prayer for damages was concerned, a stipulation was entered that the only damages suffered by the individual truck operators was the loss of business that resulted from the veto of the "Fair Truck Bill" by the Governor of Pennsylvania, and accordingly the claim for damages was limited to an amount based upon the loss of profits as a result of this veto plus the expenses incurred by the truckers' trade association

---

[3] For a discussion of the mechanics of this technique and the purposes generally underlying its use by public relations firms, see Ross, The Image Merchants, at 118, 226–227 and 266–267.

[4] The "Fair Truck Bill" referred to was introduced in the Pennsylvania Legislature in May 1951, as Senate bill 615.

[5] "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."   15 U. S. C. § 15.

for the purpose of combatting the railroads' publicity campaign. The prayer for injunctive relief was much broader, however, asking that the defendants be restrained from disseminating any disparaging information about the truckers without disclosing railroad participation, from attempting to exert any pressure upon the legislature or Governor of Pennsylvania through the medium of front organizations, from paying any private or public organizations to propagate the arguments of the railroads against the truckers or their business, and from doing "any other act or thing to further . . . the objects and purposes" of the conspiracy.

In their answer to this complaint, the railroads admitted that they had conducted a publicity campaign designed to influence the passage of state laws relating to truck weight limits and tax rates on heavy trucks, and to encourage a more rigid enforcement of state laws penalizing trucks for overweight loads and other traffic violations, but they denied that their campaign was motivated either by a desire to destroy the trucking business as a competitor or to interfere with the relationships between the truckers and their customers. Rather, they insisted, the campaign was conducted in furtherance of their rights "to inform the public and the legislatures of the several states of the truth with regard to the enormous damage done to the roads by the operators of heavy and especially of overweight trucks, with regard to their repeated and deliberate violations of the law limiting the weight and speed of big trucks, with regard to their failure to pay their fair share of the cost of constructing, maintaining and repairing the roads, and with regard to the driving hazards they create . . . ." Such a campaign, the defendants maintained, did not constitute a violation of the Sherman Act, presumably because that Act could not properly be interpreted to apply either to restraints of trade or monopolizations that result from the passage or enforcement of laws

or to efforts of individuals to bring about the passage or enforcement of laws.[6]

Subsequently, defendants broadened the scope of the litigation by filing a counterclaim in which they charged that the truckers had themselves violated §§ 1 and 2 of the Sherman Act by conspiring to destroy the railroads' competition in the long-distance freight business and to monopolize that business for heavy trucks. The means of the conspiracy alleged in the counterclaim were much the same as those with which the truckers had charged the railroads in the original complaint, including allegations of the conduct of a malicious publicity campaign designed to destroy the railroads' business by law, to create an atmosphere hostile to the railroads among the general public, and to interfere with relationships existing between the railroads and their customers. The prayer for relief of the counterclaim, like that of the truckers' original complaint, was for treble damages and an injunction restraining continuance of the allegedly unlawful practices. In their reply to this counterclaim, the truckers denied each of the allegations that charged a violation of the Sherman Act and, in addition, interposed a number of affirmative defenses, none of which are relevant here.

In this posture, the case went to trial. After hearings, the trial court entered a judgment, based upon extensive findings of fact and conclusions of law, that the railroads'

---

[6] The answer to the truckers' complaint also interposed a number of other defenses, including the contention that the activities complained of were constitutionally protected under the First Amendment and the contention that the truckers were barred from prosecuting this suit by reason of the fact that they had themselves engaged in conduct identical to that about which they were complaining with regard to the railroads and were thus *in pari delicto*. Because of the view we take of the proper construction of the Sherman Act, we find it unnecessary to consider any of these other defenses.

publicity campaign had violated the Sherman Act while that of the truckers had not.[7]  In reaching this conclusion, the trial court expressly disclaimed any purpose to condemn as illegal mere efforts on the part of the railroads to influence the passage of new legislation or the enforcement of existing law.  Instead, it rested its judgment upon findings, first, that the railroads' publicity campaign, insofar as it was actually directed at lawmaking and law enforcement authorities, was malicious and fraudulent—malicious in that its only purpose was to destroy the truckers as competitors, and fraudulent in that it was predicated upon the deceiving of those authorities through the use of the third-party technique;[8] and, secondly, that the railroads' campaign also had as an important, if not overriding, purpose the destruction of the truckers' goodwill, among both the general public and the truckers' existing customers, and thus injured the truckers in ways unrelated to the passage or enforcement of law.  In line with its theory that restraints of trade and monopolizations resulting from valid laws are not actionable under the Sherman Act, however, the trial court awarded only nominal damages to the individual truckers, holding that no damages were recoverable for loss of business due to the veto of the Pennsylvania "Fair Truck Bill."  The judgment did, however, award substantial damages to the

[7] The opinion of the District Court on the merits of the controversy is reported at 155 F. Supp. 768.  An additional opinion dealing with the question of relief is reported at 166 F. Supp. 163.  For reports of earlier opinions dealing with preliminary motions, see 113 F. Supp. 737, 14 F. R. D. 189, and 19 F. R. D. 146.

[8] The District Court did not expressly find that any particular part of the railroads' publicity campaign was false in its content.  Rather, it found that the technique of the railroads was "to take a dramatic fragment of truth and by emphasis and repetition distort it into falsehood."  155 F. Supp., at 814.

truckers' trade association as well as the broad injunction asked for in the complaint.[9]

The conclusion that the truckers' publicity campaign had not violated the Sherman Act was reached despite findings that the truckers also had engaged in a publicity campaign designed to influence legislation, as charged in the counterclaim, and despite findings that the truckers had utilized the third-party technique in this campaign. Resting largely upon the fact that the efforts of the truckers were directed, at least for the most part,[10] at trying to get legislation passed that was beneficial to them rather than harmful to the railroads, the trial court found that the truckers' campaign was purely defensive in purpose and concluded that the truckers' campaign differed from that of the railroads in that the truckers were not trying to destroy a competitor. Accordingly, it held that the truckers' campaign, though technically in restraint of trade, was well within the rule of reason which

---

[9] If anything, the injunction was even broader than had been requested in the complaint for it effectively enjoined the defendants from any publicity activities against the truckers whether or not the third-party technique was used. See 166 F. Supp., at 172–173.

[10] The trial court did recognize that on at least one occasion the truckers attempted to encourage legislation that would have been directly harmful to the railroads rather than beneficial to themselves. Thus, the court found: "About the middle of the decade [the 1940's] PMTA had a tax manual prepared charging that the railroads of Pennsylvania themselves did not pay their fair share of taxes as compared with other states and made a wide distribution of it to legislators, banks, security investment houses, etc." The trial court found, however, that this action of the truckers also lay within the rule of reason because "the truckers had been the target of a strong campaign directed to the public with the purpose of convincing the public that trucks did not pay their fair share of taxes," thus making it necessary for the truckers to "be permitted to likewise show the public that their competitors, the railroads, were actually guilty of the fault charged against the truckers." 155 F. Supp., at 803.

governs the interpretation of §§ 1 and 2 of the Sherman Act and consequently dismissed the counterclaim.

The railroads appealed from this judgment, both as to the conclusion that they had violated the Sherman Act as charged in the original complaint and as to the conclusion that the truckers had not violated the Act as charged in the counterclaim. The Court of Appeals for the Third Circuit, one judge dissenting in part, upheld the judgment of the District Court in every respect, stating that the findings amply support the judgment and that there was sufficient evidence to support all of the findings.[11] This was followed by a petition for certiorari filed on behalf of the railroads and Byoir limited to the question of the correctness of the judgment insofar as it held that they had violated the Sherman Act. Because the case presents a new and unusual application of the Sherman Act and involves severe restrictions upon the rights of these railroads and others to seek the passage or defeat of legislation when deemed desirable, we granted that petition.[12]

We accept, as the starting point for our consideration of the case, the same basic construction of the Sherman Act adopted by the courts below—that no violation of the Act can be predicated upon mere attempts to influence the passage or enforcement of laws. It has been recognized, at least since the landmark decision of this Court in *Standard Oil Co.* v. *United States*,[13] that the Sherman Act forbids only those trade restraints and monopolizations

---

[11] 273 F. 2d 218. Chief Judge Biggs dissented from the opinion of the majority of the Court of Appeals insofar as it upheld the District Court's conclusion that the railroads and Byoir had violated the Sherman Act. For similar reasons, he concurred in that part of the majority opinion which upheld the conclusion that the truckers had not violated the Act.

[12] 362 U. S. 947.

[13] 221 U. S. 1, at 51–62.

that are created, or attempted, by the acts of "individuals or combinations of individuals or corporations." [14]   Accordingly, it has been held that where a restraint upon trade or monopolization is the result of valid governmental action, as opposed to private action, no violation of the Act can be made out.[15]   These decisions rest upon the fact that under our form of government the question whether a law of that kind should pass, or if passed be enforced, is the responsibility of the appropriate legislative or executive branch of government so long as the law itself does not violate some provision of the Constitution.

We think it equally clear that the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly.   Although such associations could perhaps, through a process of expansive construction, be brought within the general proscription of "combination[s] . . . in restraint of trade," they bear very little if any resemblance to the combinations normally held violative of the Sherman Act, combinations ordinarily characterized by an express or implied agreement or understanding that the participants will jointly give up their trade freedom, or help one another to take away the trade freedom of others through the use of such devices as price-fixing agreements, boycotts, market-division agreements, and other similar arrangements.[16] This essential dissimilarity between an agreement jointly to seek legislation or law enforcement and the agreements traditionally condemned by § 1 of the Act, even if not itself conclusive on the question of the applicability of the

---

[14] *Id.*, at 57.

[15] *United States* v. *Rock Royal Co-op.*, 307 U. S. 533; *Parker* v. *Brown*, 317 U. S. 341.

[16] See *Apex Hosiery Co.* v. *Leader*, 310 U. S. 469, 491–493.

Act, does constitute a warning against treating the defendants' conduct as though it amounted to a common-law trade restraint. And we do think that the question is conclusively settled, against the application of the Act, when this factor of essential dissimilarity is considered along with the other difficulties that would be presented by a holding that the Sherman Act forbids associations for the purpose of influencing the passage or enforcement of laws.

In the first place, such a holding would substantially impair the power of government to take actions through its legislature and executive that operate to restrain trade. In a representative democracy such as this, these branches of government act on behalf of the people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives. To hold that the government retains the power to act in this representative capacity and yet hold, at the same time, that the people cannot freely inform the government of their wishes would impute to the Sherman Act a purpose to regulate, not business activity, but political activity, a purpose which would have no basis whatever in the legislative history of that Act.[17] Secondly, and of at least equal significance,

---

[17] In *Parker* v. *Brown, supra,* this Court was unanimous in the conclusion that the language and legislative history of the Sherman Act would not warrant the invalidation of a state regulatory program as an unlawful restraint upon trade. In so holding, we rejected the contention that the program's validity under the Sherman Act was affected by the nature of the political support necessary for its implementation—a contention not unlike that rejected here. The reasoning underlying that conclusion was stated succinctly by Mr. Chief Justice Stone: "Here the state command to the Commission and to the program committee of the California Prorate Act is not rendered unlawful by the Sherman Act since, in view of the latter's words and history, it must be taken to be a prohibition of individual and not state action. It is the state which has created the machinery for establishing the prorate program. Although the organization of a prorate zone is

such a construction of the Sherman Act would raise important constitutional questions. The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms. Indeed, such an imputation would be particularly unjustified in this case in view of all the countervailing considerations enumerated above. For these reasons, we think it clear that the Sherman Act does not apply to the activities of the railroads at least insofar as those activities comprised mere solicitation of governmental action with respect to the passage and enforcement of laws. We are thus called upon to consider whether the courts below were correct in holding that, notwithstanding this principle, the Act was violated here because of the presence in the railroads' publicity campaign of additional factors sufficient to take the case out of the area in which the principle is controlling.

The first such factor relied upon was the fact, established by the finding of the District Court, that the railroads' sole purpose in seeking to influence the passage and enforcement of laws was to destroy the truckers as competitors for the long-distance freight business. But we do not see how this fact, even if adequately supported in the record,[18] could transform conduct otherwise lawful

---

proposed by producers, and a prorate program, approved by the Commission, must also be approved by referendum of producers, it is the state, acting through the Commission, which adopts the program and which enforces it with penal sanctions, in the execution of a governmental policy. The prerequisite approval of the program upon referendum by a prescribed number of producers is not the imposition by them of their will upon the minority by force of agreement or combination which the Sherman Act prohibits. The state itself exercises its legislative authority in making the regulation and in prescribing the conditions of its application." 317 U. S., at 352.

[18] A study of the record reveals that the only evidence or subsidiary findings upon which this conclusory finding could be based is the undisputed fact that the railroads did seek laws by arguments and

into a violation of the Sherman Act. All of the considerations that have led us to the conclusion that the Act does not apply to mere group solicitation of governmental action are equally applicable in spite of the addition of this factor. The right of the people to inform their representatives in government of their desires with respect to the passage or enforcement of laws cannot properly be made to depend upon their intent in doing so. It is neither unusual nor illegal for people to seek action on laws in the hope that they may bring about an advantage to themselves and a disadvantage to their competitors. This Court has expressly recognized this fact in its opinion in *United States* v. *Rock Royal Co-op.*, where it was said: "If ulterior motives of corporate aggrandizement stimulated their activities, their efforts were not thereby rendered unlawful. If the Act and Order are otherwise valid, the fact that their effect would be to give coöperatives a monopoly of the market would not violate the Sherman Act . . . ." [19] Indeed, it is quite probably people with just such a hope of personal advantage who provide much of the information upon which governments must act. A construction of the Sherman Act that would disqualify people from taking a public position on matters in which they are financially interested would thus deprive the government of a valuable source of information and, at the same time, deprive the people of their right to petition in the very instances in which that right may be of the most importance to them. We reject such a construction of the Act and hold that, at least insofar

---

propaganda that could have had the effect of damaging the competitive position of the truckers. There is thus an absence of evidence of intent independent of the efforts that were made to influence legislation and law enforcement. We nonetheless accept the finding of the District Court on this issue for, in our view, the disposition of this case must be the same regardless of that fact.

[19] 307 U. S. 533, 560.

as the railroads' campaign was directed toward obtaining governmental action, its legality was not at all affected by any anticompetitive purpose it may have had.

The second factor relied upon by the courts below to justify the application of the Sherman Act to the railroads' publicity campaign was the use in the campaign of the so-called third-party technique. The theory under which this factor was related to the proscriptions of the Sherman Act, though not entirely clear from any of the opinions below, was apparently that it involved unethical business conduct on the part of the railroads. As pointed out above, the third-party technique, which was aptly ·characterized by the District Court as involving "deception of the public, manufacture of bogus sources of reference, [and] distortion of public sources of information," depends upon giving propaganda actually circulated by a party in interest the appearance of being spontaneous declarations of independent groups. We can certainly agree with the courts below that this technique, though in widespread use among practitioners of the art of public relations,[20] is one which falls far short of the ethical standards generally approved in this country. It does not follow, however, that the use of the technique in a publicity campaign designed to influence governmental action constitutes a violation of the Sherman Act. Insofar as that Act sets up a code of ethics at all, it is a code that condemns trade restraints, not political activity, and, as we have already pointed out, a publicity campaign to influence governmental action falls clearly into the category

---

[20] The extent to which the third-party technique is utilized in the public relations field· is demonstrated by the fact, found by the District Court, that each of the several public relations firms interviewed by the railroads before they finally decided to hire the Byoir organization to conduct their publicity campaign included the use of this technique in its outline of proposed activities submitted for consideration by the railroads. See 155 F. Supp., at 778.

of political activity. The proscriptions of the Act, tailored as they are for the business world, are not at all appropriate for application in the political arena. Congress has traditionally exercised extreme caution in legislating with respect to problems relating to the conduct of political activities, a caution which has been reflected in the decisions of this Court interpreting such legislation.[21] All of this caution would go for naught if we permitted an extension of the Sherman Act to regulate activities of that nature simply because those activities have a commercial impact and involve conduct that can be termed unethical.

Moreover, we think the courts below themselves recognized this fact to some extent for their disposition of the case is inconsistent with the position that the use of the third-party technique alone could constitute a violation of the Sherman Act. This much is apparent from the fact that the railroads' counterclaim against the truckers was not allowed. Since it is undisputed that the truckers were as guilty as the railroads of the use of the technique,[22] this factor could not have been in any sense controlling of the holding against the railroads. Rather,

---

[21] See, e. g., United States v. Harriss, 347 U. S. 612. Cf. United States v. Rumely, 345 U. S. 41.

[22] The District Court expressly recognized this fact in its opinion: "The record discloses that both sides used, or wanted to use, fronts and/or the propaganda technique." 155 F. Supp., at 816. This conclusion was amply supported by specific findings. Thus, the court found: "The record establishes that the truckers wrote to and made personal contacts with legislators in support of bills increasing the weight of trucks; that they had representatives of other industries write and make personal contacts with legislators in Harrisburg without disclosing trucker connections; and that they had such persons intentionally refrain from advising the legislators and the said officials that the letters and contacts had been solicited; that they solicited from legislators statements in support of their position and had news releases issued thereon." 155 F. Supp., at 803.

it appears to have been relied upon primarily as an indication of the vicious nature of the campaign against the truckers. But whatever its purpose, we have come to the conclusion that the reliance of the lower courts upon this factor was misplaced and that the railroads' use of the third-party technique was, so far as the Sherman Act is concerned, legally irrelevant.

In addition to the foregoing factors, both of which relate to the intent and methods of the railroads in seeking governmental action, the courts below rested their holding that the Sherman Act had been violated upon a finding that the purpose of the railroads was "more than merely an attempt to obtain legislation. *It was the purpose and intent . . . to hurt the truckers in every way possible even though they secured no legislation."* (Emphasis in original.) Specifically, the District Court found that the purpose of the railroads was to destroy the goodwill of the truckers among the public generally and among the truckers' customers particularly, in the hope that by doing so the over-all competitive position of the truckers would be weakened, and that the railroads were successful in these efforts to the extent that such injury was actually inflicted. The apparent effect of these findings is to take this case out of the category of those that involve restraints through governmental action and thus render inapplicable the principles announced above. But this effect is only apparent and cannot stand under close scrutiny. There are no specific findings that the railroads attempted directly to persuade anyone not to deal with the truckers. Moreover, all of the evidence in the record, both oral and documentary, deals with the railroads' efforts to influence the passage and enforcement of laws. Circulars, speeches, newspaper articles, editorials, magazine articles, memoranda and all other documents discuss in one way or another the railroads' charges that heavy trucks injure the roads, violate the

laws and create traffic hazards, and urge that truckers should be forced to pay a fair share of the costs of rebuilding the roads, that they should be compelled to obey the laws, and that limits should be placed upon the weight of the loads they are permitted to carry. In the light of this, the findings of the District Court that the railroads' campaign was intended to and did in fact injure the truckers in their relationships with the public and with their customers can mean no more than that the truckers sustained some direct injury as an incidental effect of the railroads' campaign to influence governmental action and that the railroads were hopeful that this might happen.[23] Thus, the issue presented by the lower courts' conclusion of a violation of the Sherman Act on the basis of this injury is no different than the issue presented by the factors already discussed. It is inevitable, whenever an attempt is made to influence legislation by a campaign of publicity, that an incidental effect of that campaign may be the infliction of some direct injury upon the interests of the party against whom the campaign is directed. And it seems equally inevitable that those conducting the campaign would be aware of, and possibly even pleased by, the prospect of such injury. To hold that the knowing infliction of such injury renders the campaign itself illegal would thus be tantamount to out-

---

[23] Here again, the petitioners have leveled a vigorous attack upon the trial court's findings. As a part of this attack, they urge that there is no basis in reason for the finding that some shippers quit doing business with the truckers as a result of the railroads' publicity campaign. Their contention is that since the theme of the campaign was that the truckers had an unfair competitive advantage and could consequently charge unfairly low prices, the campaign would have encouraged, rather than discouraged, shippers who availed themselves of the truckers' services. This argument has considerable appeal but, as before, we find it unnecessary to pass upon the validity of these findings for we think the conclusion must be the same whether they are allowed to stand or not.

lawing all such campaigns. We have already discussed the reasons which have led us to the conclusion that this has not been done by anything in the Sherman Act.

There may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified. But this certainly is not the case here. No one denies that the railroads were making a genuine effort to influence legislation and law enforcement practices. Indeed, if the version of the facts set forth in the truckers' complaint is fully credited, as it was by the courts below, that effort was not only genuine but also highly successful. Under these circumstances, we conclude that no attempt to interfere with business relationships in a manner proscribed by the Sherman Act is involved in this case.

In rejecting each of the grounds relied upon by the courts below to justify application of the Sherman Act to the campaign of the railroads, we have rejected the very grounds upon which those courts relied to distinguish the campaign conducted by the truckers. In doing so, we have restored what appears to be the true nature of the case—a "no-holds-barred fight" [24] between two industries both of which are seeking control of a profitable source of income.[25] Inherent in such fights, which are commonplace in the halls of legislative bodies, is the possibility, and in many instances even the probability, that one group or the other will get hurt by the arguments that are made.

---

[24] We borrow this phrase from the dissenting opinion below of Chief Judge Biggs.

[25] Since the commencement of this litigation, a new bill increasing truck-weight limits has passed the Pennsylvania Legislature and has become law by virtue of the Governor's approval. Thus, the fight goes on.

In this particular instance, each group appears to have utilized all the political powers it could muster in an attempt to bring about the passage of laws that would help it or injure the other. But the contest itself appears to have been conducted along lines normally accepted in our political system, except to the extent that each group has deliberately deceived the public and public officials. And that deception, reprehensible as it is, can be of no consequence so far as the Sherman Act is concerned. That Act was not violated by either the railroads or the truckers in their respective campaigns to influence legislation and law enforcement. Since the railroads have acquiesced in the dismissal of their counterclaim by not challenging the Court of Appeals' affirmance of that order in their petition for certiorari, we are here concerned only with those parts of the judgments below holding the railroads and Byoir liable for violations of the Sherman Act. And it follows from what we have said that those parts of the judgments below are wrong. They must be and are

*Reversed.*