**COLUMBIA PICTURES INDUSTRIES, INC., Embassy Pictures, Paramount Pictures Corporation, Twentieth Century-Fox Film Corporation, Universal City Studios, Inc., Walt Disney Productions and Warner Bros. Inc., Plaintiffs,**

v.

**REDD HORNE INC., 2823 Corporation, Glenn W. Zeny, Individually and d/b/a Maxwell's Video Showcase and Maxwell's Video Showcase East, Defendants.**

Civ. A. No. 83–0016 Erie.

United States District Court,
W.D. Pennsylvania.

July 28, 1983.

Robert L. Byer, Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., Bancroft D. Haviland, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for plaintiffs.

Howard A. Hain, Erie, Pa., Allan Dabrow, Pechner, Dorfman, Wolffe, Rounick & Cabot, Philadelphia, Pa., for defendants.

## OPINION

MENCER, District Judge.

### INTRODUCTION

This is an action for copyright infringement brought under Title 17 of the United States Code, entitled "Copyrights", 17 U.S.C. §§ 101–810 (1976). The plaintiffs, seven major motion picture producers and distributors, are either the owners or co-owners of copyrights in the motion pictures which are the subject matter of this lawsuit or are the exclusive licensees for distribution of these motion pictures or have by contract the right to enforce these copyrights.[1] The alleged infringement we are concerned with here results from the defendants' use of video cassette copies of these copyrighted motion pictures in a video showcasing operation. The defendants[2] op-

---

1. The defendants have forwarded as one ground for summary judgment in their favor the contention that the plaintiffs have failed to establish ownership of the copyrights involved in this lawsuit. The plaintiffs have submitted as exhibits photocopies of a great number of copyright registration certificates. Registration certificates constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate. 17 U.S.C. § 410(c). We find there is sufficient evidence of ownership by the plaintiffs of certain of the copy-

rights involved here to allow the Court to determine the issue of whether the defendants' activities constitute copyright infringement.

2. The named defendants are Redd Horne, Inc., 2823 Corporation, and Glenn W. Zeny individually and doing business as Maxwell's Video Showcase and Maxwell's Video Showcase East. There is a suggestion in the record that a proper defendant to this action is a corporation known as Maxwell's Video Showcase Limited (MVSL) which has as its sole stockholder Rob-

erate retail outlets for home video equipment and accessories at two locations in Erie, Pennsylvania. These facilities, Maxwell's Video Showcase and Maxwell's Video Showcase East (collectively Maxwell's), sell and rent video cassette recorders and pre-recorded video cassettes of copyrighted materials and also sell blank video cassettes. It is alleged that Maxwell's performs video cassettes of the plaintiffs' copyrighted motion pictures to customers at its facilities in violation of the plaintiffs' exclusive rights under the federal copyright laws.

## FACTS

The alleged performance of video cassettes at Maxwell's facilities is the sole basis for the plaintiffs' charge of copyright infringement in this particular lawsuit.[3] The plaintiffs base their claim of infringement on the argument that Maxwell's showcasing constitutes a "public performance" of the plaintiffs' copyrighted motion pictures, and is an infringement of the exclusive right to perform their copyrighted work publicly which is enjoyed by copyright owners. In order to place the discussion in the proper context, we find it necessary to set forth in some detail a description of the two Maxwell's facilities and the showcasing activities which allegedly result in infringement of the plaintiffs' copyrights before proceeding to an analysis of the applicable statutory provisions governing the issue.

The original Maxwell's Video Showcase opened on the west side of Erie on July 22, 1981. Maxwell's Video Showcase East opened some fifteen months later on October 29, 1982 following the success of the original Maxwell's and some area competitors. The west side store is approximately sixty feet wide by sixty feet long and consists of a small showroom area in the front of the store and the showcase area in the rear portion of the store. The showroom area contains the equipment and materials which Maxwell's has available for sale or rent and a counter area which is attended by employees of Maxwell's. This showroom area also contains dispensing machines for popcorn and carbonated beverages. There is a wall about three feet behind the counter area. The showcase area, or viewing rooms, are located beyond this wall. These viewing rooms are essentially private booths with space for either two, three or four viewers. The west side facility initially contained twenty-one such rooms and was later expanded to contain forty-four viewing rooms. The design of a particular room may vary in shape from a square to a more triangular design and in size depending on the number of viewers it is designed to accommodate. The interior of the rooms does not vary significantly. A typical room is approximately four feet by six feet, is carpeted on the floor and walls, and is furnished with an upholstered bench at the back of the room and a nineteen inch color television at the front. Maxwell's Video Showcase East is approximately twenty-four feet wide by one hundred twenty feet long, has a front showroom area similar to the one at Maxwell's Video Showcase and contains forty-one rooms of essentially the same design and interior decoration as the ones at the west side store. At both facilities approximately twenty percent of the rooms hold up to four people and the remainder will accommodate only two.

The procedure to be followed by a patron wishing to utilize one of the viewing rooms is exactly the same at both facilities. Maxwell's terms the use of these rooms an in-store rental. The rental is initiated by the viewer selecting the motion picture he wishes to see from a catalogue of the film titles available at Maxwell's. This catalogue changes periodically with the addition

ert W. Zeny. 2823 Corporation has become MVSL as a result of a change in the corporate name. MVSL operates Maxwell's Video Showcase and Maxwell's Video Showcase East. Redd Horne, Inc. and Glenn W. Zeny have denied the plaintiffs' allegations of their connection with the alleged infringing activities throughout the course of these proceedings.

3. It is important to note here what is not at issue in this infringement action. The plaintiffs do not challenge either the possession of the video cassette copies by the defendants or the rental of the cassettes for private in-home use by Maxwell's patrons.

of new titles to Maxwell's library of cassettes. The patron then reserves a room and is charged a fee for the use of the room and the video cassette copy of the chosen film if the cassette is available at that time.[4] The fee is based on the time of day and on the number of persons using the room.[5] The patrons may then help themselves to popcorn and cold drinks before going to their assigned room. The cassette does not begin to run until the viewers have situated themselves in the room and closed the door. Closing the door to the viewing room activates an automatic signal in the counter area at the front of the store where an employee of Maxwell's starts the video cassette machine which contains the cassette selected by the viewer. The individual viewers may adjust the lighting in the rooms by use of a rheostat located in the room. They may also adjust the various volume, brightness and color levels on the television set, however, the video cassette machines are all located in one central area on the wall behind the counter in the front showroom and are operated only by employees of Maxwell's.

Access to a particular room is limited to the two, three or four individuals who rent it as a group. Strangers are not grouped in order to fill a particular room to capacity and no one can enter a room which is occupied. Maxwell's does have a club for home rentals of video cassettes, however, membership in this club is not a prerequisite for use of the in-store rental facilities and at least a portion of Maxwell's in-store rentals are the result of people walking in off the street and requesting to view one of the cassettes.

Maxwell's has advertised on Erie radio stations and on the theater and restaurant pages of the Erie Times newspaper. There are also advertisements resembling movie posters at the entrances to the two Maxwell's facilities.

## PROCEDURAL POSTURE

The plaintiffs filed the complaint initiating this action on January 19, 1983. The defendants filed an answer and counterclaim on February 28 and an amended answer and counterclaim on May 9. The plaintiffs moved to dismiss the counterclaim on March 23 and briefs on that motion have been submitted by both sides. On May 31 the defendants moved for summary judgment and the plaintiffs countered with their own motion for summary judgment on June 1. Numerous briefs and exhibits have been filed by both sides addressing the issue before the Court for summary judgment. The Court held a hearing on the motion to dismiss and on the cross motions for summary judgment on July 1. The parties have stated, and the Court finds, that there are no issues of material fact which would preclude the entry of summary judgment in this action. We are, therefore, in a position to enter a ruling on all outstanding motions at this time.

## DISCUSSION

A. Motions for summary judgment.

The plaintiffs do not contend that the video cassette copies of plaintiffs' copyrighted movies which are used in the defendants' in-store rental, or showcasing, operation were obtained by any illegitimate means; and, in fact, the cassettes used by the defendants were obtained either by purchasing them from the plaintiffs or their authorized distributors. In other words, the plaintiffs do not allege that the defendants have no right to possess the particular video cassette copies they have purchased or that rental of such copies for in-home use infringes their copyrights. The complaint

---

4. There is only one copy of each film available at each of the two locations at any given time, therefore, if two strangers wish to view the same video cassette at the same time in the same store one will be unable to do so.

5. The in-store rental fee schedule at both Maxwell's locations from noon to 6 p.m. is $5 for two viewers, $6 for three and $7 for four. The cost increases by $1 for each group size from 6 p.m. to closing. Maxwell's charges $2 for a twenty-four hour outside rental and $4.95 for forty-eight hours.

is based solely on the allegation that the defendants' showcasing operation is a public performance, as that term is defined by the federal copyright laws, and that the exclusive right to perform a work publicly is retained by the copyright owner despite the sale of a particular copy of the owner's copyrighted work.

The proposition that a copyright owner may dispose of a copy of his work and at the same time retain all underlying copyrights which are not expressly or impliedly disposed of with that copy is beyond contention. Section 202 of the 1976 Copyright Act states that one may own a copy of another's copyrighted work yet not acquire any of the exclusive rights accompanying the copyright.

> Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied. Transfer of ownership of any material object, including the copy or phonorecord in which the work is first fixed, does not of itself convey any rights in the copyrighted work embodied in the object; nor, in the absence of an agreement, does transfer of ownership of a copyright or of any exclusive rights under a copyright convey property rights in any material object.

17 U.S.C. § 202 (1976). The plaintiffs' sales of video cassette copies of their copyrighted motion pictures to the defendants resulted only in a waiver of the exclusive distribution right held in those particular copies sold, 17 U.S.C. § 109(a) (1976), therefore, any other rights the plaintiffs held in the motion pictures remain with them in their capacity as copyright owners.

Those exclusive rights which are enjoyed by the plaintiffs as copyright owners are enumerated in section 106 of the 1976 Copyright Act, which provides that, in the case of motion pictures:

> [s]ubject to sections 107 through 118, the owner of copyright under this title [17 U.S.C. §§ 101–810] has exclusive rights to do and to authorize any of the following:

> (1) to reproduce the copyrighted work or phonorecords;

> (2) to prepare derivative works based upon the copyrighted work;

> (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;

> (4) in the case of . . . motion pictures and other audiovisual works, to perform the copyrighted work publicly; and

> (5) in the case of . . . the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly.

17 U.S.C. § 106 (1976).

The rights granted by section 106 are separate and distinct and, as such, are severable from one another. The grant of one does not waive any of the other exclusive rights. *See Interstate Hotel Co. v. Remick Music Corp.*, 157 F.2d 744 (8th Cir. 1946) (held that exercise of one of the exclusive rights granted under section 1 of the 1909 Act did not result in abandonment of the other of such rights). *See generally* 2 M. Nimmer, *Nimmer on Copyright* § 8.01[A], at 8–11—8–12 (1983) (discussing the cumulative and severable nature of the exclusive rights granted by section 106 of the 1976 Act and citing *Interstate Hotel Co.*, 157 F.2d 744, in support of the proposition). The plaintiffs' sales of video cassette copies of their copyrighted motion pictures which resulted in a waiver of their exclusive rights to distribute those copies sold, 17 U.S.C. § 109(a) (1976), did not result in a waiver of any of the other exclusive rights enumerated in section 106. Thus the plaintiffs retain the exclusive right to perform their motion pictures publicly despite the sale of video cassette copies to the defendants.

"Anyone who violates any of the exclusive rights of the copyright owner as provided by sections 106 through 118 . . . is an infringer of the copyright." 17 U.S.C. § 501(a) (1976). The issue is thus reduced to a determination of whether Maxwell's showcasing of copyrighted pre-recorded vid-

eo cassettes constitutes a public performance of the motion pictures embodied in those cassettes. If it does it is an infringement of the plaintiffs' copyrights.

The exclusive right of a copyright owner to perform his copyrighted work in public is found in clause (4) of section 106. We begin our analysis of section 106(4) with the definitions "perform" and "perform . . . a work 'publicly'" which are found in 17 U.S.C. § 101 (1976). "To perform a work means . . . in the case of a motion picture or other audiovisual work, to show its images in any sequence or to make the sounds accompanying it audible." 17 U.S.C. § 101 (1976). The House of Representatives report accompanying the 1976 Act provides further explanation of what constitutes a performance of motion pictures.

> The definition of "perform" in relation to a "motion picture or other audio visual work" is "to show its images in any sequence or to make the sounds accompanying it audible." The showing of portions of a motion picture . . . must therefore be sequential to constitute a "performance" rather than a "display", but no particular order need be maintained. The purely aural performance of a motion picture sound track, or of sound portions of an audiovisual work, would constitute a performance of the "motion picture or other audiovisual work"; but, where some of the sounds have been reproduced separately on phonorecords, a performance from the phonorecord would not constitute performance of the motion picture or audiovisual work.

H.R.Rep. No. 1476, 94th Cong., 2d Sess. 63–64, *reprinted in* 1976 U.S.Code Cong. & Ad.News 5659, 5677. There can be no doubt that the playing of a video cassette results in a sequential showing of its images and in making the sounds accompanying it audible. Video cassette showcasing, such as that done at Maxwell's, is a performance under the copyright laws. Our inquiry is thus further reduced to a determination of whether or not such performances are public and, therefore, an infringement of the plaintiffs' copyrights.

The applicable statutory definition states that:

> [t]o perform . . . it at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered . . .

17 U.S.C. § 101 (1976). The plaintiffs contend that the definition found in clause (1) is written in the disjunctive form resulting in the creation of two separate categories of what is public, i.e., (1) at a place open to the public or (2) at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered. The defendants argue that the definition consists of two complementary phrases designed to express congressional concern with the composition of the group viewing a performance as opposed to the place where the viewing occurs. In support of this argument the defendants cite the legislative history accompanying this portion of the definition of public performance.

> Under clause (1) of the definition of "publicly" in section 101, a performance . . . is "public" if it takes place "at a place open to the public or at any place where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered." One of the principal purposes of the definition was to make clear that, contrary to the decision in *Metro-Goldwyn-Mayer Distributing Corp. v. Wyatt*, 21 C.O.Bull. 203 (D.Md.1932), performances in "semi-public" places such as clubs, lodges, factories, summer camps, and schools are "public performances" subject to copyright control. The term "a family" in this context would include an individual living alone, so that a gathering confined to the individual's social acquaintances would normally be regarded as private. Routine meetings of businesses and governmental personnel would be excluded because they do not represent the gathering of a "substantial number of persons."

H.R.Rep. No. 1476, 94th Cong., 2d Sess. 64, *reprinted in* 1976 U.S.Code Cong. & Ad.

News 5659, 5677–78. The parties' positions may create what amounts to a distinction without a difference; nevertheless, the language of the statute and its legislative history indicate that Congress' concern was with the composition of the audience. This conclusion does not emasculate the plaintiffs' contention that a public performance could occur in either a place open to the public in a general sense or in a place access to which is in some way restricted and which is therefore more in the nature of a semi-public place. *Lerner v. Schectman,* 228 F.Supp. 354 (D.Minn.1964), a case decided under the 1909 Act, holds that a performance may be found to be public even if the composition of the audience is restricted to some degree if, despite such restriction, a substantial portion of the public has the potential to attend the performance. *See also* 2 M. Nimmer, § 8.14[C][1], at 8–138–39. Maxwell's does not limit use of its viewing rooms in any manner other than a requirement that all viewers be either relatives or close social acquaintances. The defendants contend that this restriction on the use of the viewing rooms is enough to take Maxwell's showcasing outside the realm of a public performance. The plaintiffs argue that Maxwell's is clearly open to the public and that, at any rate, it is a place where a substantial number of persons "outside of a normal circle of a family and its social acquaintances is gathered."

■ We find that the composition of the audience at Maxwell's is of a public nature, and that showcasing the plaintiffs' copyrighted motion pictures results in repeated public performances which infringe the plaintiffs' copyrights. Our finding is based on the view that the viewing rooms at Maxwell's more closely resemble mini-movie theaters than living rooms away from home. At least as regards the composition of the audiences at Maxwell's, the showcasing operation is not distinguishable in any significant manner from the exhibition of films at a conventional movie theater. Both types of facilities are open to all members of the general public. Access to the actual viewing area of both theaters is limited to paying customers. Seating in both facilities is of a finite number and, at both facilities, the actual performance of the motion picture is handled by employees of the theater. We recognize that each performance at Maxwell's is limited in its potential audience size to a maximum of four viewers at any one time, however, we do not believe this limitation takes Maxwell's showcasing operation outside the ambit of the statutory definition of a public performance because the potential exists for a substantial portion of the public to attend such performances over a period of time.

Our conclusion that Maxwell's showcasing constitutes infringing public performances is bolstered by the second clause of the statutory definition of public performance. Under this clause, to perform a work publicly means:

(2) to transmit or otherwise communicate a performance . . . of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance . . . receive it in the same place or in separate places and at the same time or at different times.

17 U.S.C. § 101 (1976). Professor Nimmer, in a remarkably prescient discussion of this portion of the definition, concluded that Congress intended that "*if the same copy* . . . of a given work is repeatedly played (i.e. 'performed') by different members of the public, albeit at different times, this constitutes a 'public' performance." 2 M. Nimmer, § 8.14[C][3], at 8–142. Nimmer cites as one example the peep show where, although no more than one person at a time can observe a given performance, repeated playing of the same copy of the material results in numerous performances seen by the public, Nimmer, foreseeing an operation similar to Maxwell's, goes on to state that:

one may anticipate the possibility of theaters in which patrons occupy separate screening rooms, for greater privacy, and in order not to have to await a given hour for commencement of a given film. These too should obviously be regarded as

public performances within the underlying rationale of the Copyright Act.

*Id.* at 8–142. The two Maxwell's facilities each have only one copy of a given film title and, therefore, must perform the same copy of a given work repeatedly. We find that Congress intended that this portion of the definition also serve as protection for copyright owners from infringing performances such as those accomplished by Maxwell's showcasing.

B. Motion to dismiss defendants' counterclaim.

The defendants' counterclaim contains four counts. Count one alleges that the sole motivation of the plaintiffs in bringing the infringement action which initiated this lawsuit was "to drive the Defendants-Counterclaimants from the newly created showcasing market and to reserve that market solely to the Plaintiffs-Counterdefendants." Count two alleges that the activities of the plaintiffs "constitute an unlawful tying arrangement in violation of the federal antitrust laws including the Sherman Act and the Clayton Act." We will address these two counts before moving on to the final two.

■ Groups with common interests may, without violating the antitrust laws, use the channels and procedures of the courts to protect their business and economic interests from interference by competitors. *See California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961). This exemption from the antitrust laws is limited by the requirement that utilization of the courts must be in good faith and not a mere sham. 365 U.S. at 144, 81 S.Ct. at 533.

■ A good faith effort to enforce one's copyright is not conduct which violates the antitrust laws. *Edward B. Marks Music Corp. v. Colorado Magnetics, Inc.,* 497 F.2d 285 (10th Cir.1974); *Alberto-Culver Company v. Andrea Dumon, Inc.,* 466 F.2d 705 (7th Cir.1972). Our finding that Maxwell's showcasing results in an infringement of the plaintiffs' copyrights removes any suggestion that the infringement suit was a sham or brought in bad faith. Dismissal of the two antitrust claims is appropriate.

■ Count three of the counterclaim alleges, without elaboration, that the plaintiffs' filing of the infringement suit constitutes a malicious interference with the business relationships of the defendants. We are mindful of, and in agreement with, case law which cautions a trial court to construe pleadings liberally when ruling on a motion pursuant to Fed.R.Civ.P. 12(b)(6), however, even those decisions require no more than a consideration of all facts alleged and a drawing of all fairly deducible inferences from those facts. *See Miller v. American Telephone and Telegraph Company,* 507 F.2d 759 (3d Cir.1974). Where, as here, no facts in support of the allegations are presented, dismissal of the claim is appropriate.

■ Count four is a claim for the breach of an implied contract of good faith and fair dealing. The facts in the record reveal no possible manner in which a claim based on an alleged breach of a contractual relationship between the plaintiffs and the defendants can be maintained. We will, therefore, dismiss the defendants' counterclaim in its entirety.

### CONCLUSION

The defendants' showcasing operations at Maxwell's Video Showcase and Maxwell's Video Showcase East constitute public performances of the plaintiffs' copyrighted works and are therefore infringements of that exclusive right. The plaintiffs' motion for summary judgment will be granted and, accordingly, the defendants' motion for summary judgment will be denied. The defendants' counterclaim fails to state any claim upon which relief can be granted for the reasons stated above. The plaintiffs'

motion to dismiss the counterclaim will be granted. An appropriate order will issue.