In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-1871

UNITED AIRLINES, INC., and THE OFFICIAL COMMITTEE OF UNSE-
CURED CREDITORS,

*Plaintiffs-Respondents-Appellees*,

*v.*

U.S. BANK N.A. and THE BANK OF NEW YORK, as Indenture Trus-
tees,

*Defendants-Petitioners-Appellants.*

Petition for a Writ of Mandamus to, and Appeal from, the United States
District Court for the Northern District of Illinois, Eastern Division.
Nos. 04 C 8304 & 05 C 289 (04 A 4149) — **John W. Darrah**, *Judge.*

SUBMITTED APRIL 27, 2005 — DECIDED MAY 6, 2005[†]

Before COFFEY, EASTERBROOK, and WILLIAMS, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* When United Airlines entered
bankruptcy in 2002, it operated about 460 airplanes. Some 175 of
these had been acquired via financing leases subject to 11 U.S.C.
§1110, which provides that to retain leased planes a debtor must pay
the whole rent. The statute contains an exception for consensual
workouts, see §1110(b), and United's lessors initially agreed to ac-
cept less than the contractual payments. As the reorganization
dragged on, however, some of the lessors concluded that United

---

[†] This opinion is being issued in typescript. A printed copy will follow.

would not be reorganized successfully and demanded their planes back. When United entered bankruptcy in 2002, and negotiated the current reduced rental payments, it projected that reorganization would be accomplished in six months. Two and a half years later, United is losing more than $1 billion annually and is not promising to propose a plan of reorganization any time soon. Some creditors are bound to have second thoughts. In November 2004 the banks serving as indenture trustees for three of the leases demanded that United immediately return 14 of the aircraft unless it cured all defaults and resumed the full rental payments promised by contract.

United neither paid nor returned the planes. Instead it filed an adversary action accusing the indenture trustees of violating the Sherman Act, 15 U.S.C. §1, by coordinating their efforts to preserve the lenders' collateral and collect the promised payments. The trustees violate the antitrust laws, according to United, by insisting that the debtor deal with them collectively about all 175 leased airplanes. One might suppose that coordination is a normal function of indenture trustees, which exist under the Trust Indenture Act of 1939 precisely because individual lenders may be too diffuse to protect their own interests. See 15 U.S.C. §77bbb(a)(1). Coordination is especially common in bankruptcy, which often is described as a collective proceeding among lenders. See, e.g., *In re American Reserve Corp.*, 840 F.2d 487, 489 (7th Cir. 1988); Douglas G. Baird & Thomas H. Jackson, *Corporate Reorganizations and the Treatment of Diverse Ownership Interests: A Comment on Adequate Protection of Secured Creditors in Bankruptcy*, 51 U. Chi. L. Rev. 97, 105–09 (1984). The name of an entity that intervened to support United's contention—"The Official Committee of Unsecured Creditors"— demonstrates as much. No wonder that the second circuit has described as "bordering on the frivolous" a contention that the antitrust laws forbid creditors to coordinate their positions in bankruptcy. *Sharon Steel Corp. v. Chase Manhattan Bank, N.A.*, 691 F.2d 1039, 1052–53 (2d Cir. 1982).

Competition comes at the time loans are made; cooperation in an effort to collect as much as possible of the amounts due under competitively determined contracts is not the sort of activity with which the antitrust laws are concerned. Moreover, businesses are entitled under the *Noerr–Pennington* doctrine to act jointly when presenting requests to courts and agencies. See *Eastern Railroad*

*Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657 (1965). Collective renegotiation succeeds only if the court approves. See *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508 (1972) (holding that the *Noerr-Pennington* doctrine applies to collective presentations in litigation).

On top of all this comes §1110(a)(1), which provides that

> the right … of a lessor or conditional vendor of [airplanes], to take possession of such equipment in compliance with a security agreement, lease, or conditional sale contract, and to enforce any of its other rights or remedies, under such security agreement, lease, or conditional sale contract, to sell, lease, or otherwise retain or dispose of such equipment, is not limited or otherwise affected by any other provision of this title or by any power of the court.

This takes aircraft out of the automatic stay, see 11 U.S.C. §362, and entitles secured lenders and financing lessors to repossess their collateral. There are only two exceptions. Section 1110(b), which we have mentioned, says that the creditor or lessor may agree to allow the debtor to continue using the equipment. This is how United has retained the aircraft so far. Section 1110(a)(2), the other exception, gives the debtor 60 days after the bankruptcy begins to come current on its payments and provides that, if the debtor thereafter makes all payments called for by the contracts, it may retain the airplanes. United is not paying the full amount required by these leases, so §1110(a)(2) does not assist it.

Given the breadth of §1110(a)(1), United's demand for an injunction might have been denied out of hand. Instead, however, Bankruptcy Judge Wedoff entered a temporary restraining order forbidding the trustees to repossess the airplanes. He stated that despite its reference to "any power of the court" §1110(a)(1) does not affect the court's ability to award injunctive relief under non-bankruptcy law, such as the Sherman Act. This is hard to reconcile with the statute's text. Cf. *Norfolk & Western Ry. v. American Train Dispatchers Association*, 499 U.S. 117 (1991) (a statute applicable to rail consolidations and similar in structure to §1110 blocks resort to *all* other sources of law). Moreover, the judge did not explain why United's antitrust contention is strong enough to support injunctive relief in the teeth of a statute that curtails remedies. Section 1110(a)(1) does not bar a damages action for wrongful repossession;

if the indenture trustees have indeed violated the antitrust laws they face treble damages and criminal prosecution. Cf. *Vendo Co. v. Lektro-Vend Corp.*, 433 U.S. 623 (1977) (antitrust laws do not create exception to the Anti-Injunction Act). But this statute *does* give them their collateral, and by assuring them a self-help remedy it makes aircraft credit available on better terms. See Jason J. Kilborn, *Thou Canst Not Fly High With Borrowed Wings: Airline Finance and Bankruptcy Code Section 1110*, 8 Geo. Mason L. Rev. 41, 62–63 (1999); cf. Gregory P. Ripple, *Special Protection in the Air(line Industry): The Historical Development of Section 1110 of the Bankruptcy Code*, 78 Notre Dame L. Rev. 281 (2002).

Temporary retraining orders are at least brief—they last for 20 days at most, including the 10-day extension allowed by Fed. R. Civ. P. 65(b), incorporated by Fed. R. Bankr. P. 7065. Bankruptcy Judge Wedoff promised to explore the subject more fully at a hearing in December 2004 on United's motion for a preliminary injunction. United then sought discovery into all of the indenture trustees' communications, not only with other trustees and lenders but also with their lawyers. Needless to say this led to protests that the matters United wants are covered by the attorney-client and work-product privileges. The bankruptcy judge held, however, that United's antitrust theory is strong enough to override these privileges—for they cannot be used to shield ongoing crimes, and a violation of the Sherman Act is a felony. So the bankruptcy judge demanded that the materials be produced, either directly to United or to the court for an *in camera* inspection (which, the judge noted, might reveal that no crime was in process and thus that the privileges continue). Seeking to set up an opportunity for appellate review, the trustees respectfully declined to comply. The bankruptcy judge might have drawn an adverse inference and entered a preliminary injunction, from which the trustees could have appealed. Or he might have held them in criminal contempt, again setting up an appeal. Instead, however, the judge *declared* them "in contempt" but did not impose any sanction, even a daily fine. Nor did the judge proceed to the scheduled hearing; he put it off until the trustees disclosed the privileged materials.

The trustees appealed to the district judge, who has authority to review interlocutory as well as final decisions of bankruptcy judges. 28 U.S.C. §158(a). They filed one appeal from the TRO issued on

November 26, 2004, and another from the declaration of contempt on December 9, 2004. The district judge dismissed both appeals, ruling that neither of the bankruptcy judge's orders is "final" and declining to exercise jurisdiction to review the interlocutory orders. The upshot is that the lessors are enjoined from repossessing the aircraft, without either review by an Article III judge or any prospect of such review—for the bankruptcy judge will not hold a hearing on the motion for injunctive relief until the trustees cough up the privileged documents, which they do not plan to do until they obtain the appellate review that has been denied to them.

For obvious reasons, the prospect of stasis is delightful to United and its unsecured creditors but unsatisfactory to the lessors. They ask this court to issue a writ of mandamus that will lift the injunction, or at least get the proceedings back on track by resolving the privilege debate. They also ask us to treat their papers as a notice of appeal, should appellate jurisdiction be available. (The petition for mandamus contains the information required by Fed. R. App. P. 3. See *Smith v. Barry*, 502 U.S. 244 (1992).) We conclude that the TRO became an injunction when it extended past 20 days, so the district court had jurisdiction and we have appellate jurisdiction under 28 U.S.C. §1292(a)(1). See *Connecticut National Bank v. Germain*, 503 U.S. 249 (1992). The debate about privilege, however, cannot now be resolved, because a bare declaration of contempt, without consequences, is neither a final order nor within the scope of the mandamus power. See *Kerr v. United States District Court*, 426 U.S. 394 (1976)*; Powers v. Chicago Transit Authority*, 846 F.2d 1139 (7th Cir. 1988); *In re Lewis*, 212 F.3d 980, 983 (7th Cir. 2000). Given our view of the merits, however, the privilege dispute has no continuing significance.

Temporary restraining orders that extend past 20 days are reviewable as preliminary injunctions, no matter what the rendering judge may have called them. See *Sampson v. Murray*, 415 U.S. 61, 86–88 (1974); *Granny Goose Foods, Inc. v. Teamsters Union*, 415 U.S. 423 (1974). The district court thought this principle inapplicable because the trustees consented to the maintenance of the status quo until the hearing on preliminary injunctive relief. An order supported by consent is not appealable. See *Geneva Assurance Syndicate, Inc. v. Medical Emergency Services Associates*, 964 F.2d 599

(7th Cir. 1992). The problem with this view of matters is that the trustees did not consent to indefinite, non-appealable relief.

The trustees' statement to which the district judge referred was an agreement on December 8, while the bankruptcy judge had the privilege dispute under advisement, to extend the TRO "pending further order of the court." Such an order came the next day, when the bankruptcy judge declared the trustees in contempt, anticipating (though incorrectly) that this would facilitate review by the district judge and this court. We do not understand the trustees to have consented to a procedure that would *prevent* any other "order of the court" from being entered. It would not be sensible to understand their consent as permission to cancel the hearing and keep the TRO in force forever. Yet that is exactly what has happened. The bankruptcy judge called off the hearing, and United now contends that as a result it may keep the collateral without paying the agreed price and without any review by an Article III judge. The trustees did not (and do not) consent to *that* state of affairs. The order thus must be treated as a preliminary injunction, open to appellate review. Because the issues are legal, we can supply that review ourselves without remanding to the district judge.

Section 1110(a)(1) gives the trustees a right to the return of aircraft unless United pays the full rental or the lessors agree to accept a lower price. Those conditions are not satisfied, so the bankruptcy judge must dissolve the injunction and allow the lessors to repossess their collateral. It does not matter whether, as United suspects, the lessors are engaged in strategic behavior. The statute gives them that entitlement, treating aircraft different from other assets. A credible threat to repossess the aircraft changes the terms on which post-bankruptcy bargains can be struck; it is exactly this prospect that makes credit available on better terms when air carriers shop for financing in the first place. United obtained the sort of terms that were available from creditors secure in their ability to repossess the collateral; it must live with those terms now, just as it must pay the current market price for jet fuel.

The final clause of §1110(a)(1) prevents bankruptcy judges from using *any* source of law, including antitrust, as the basis of an injunction against repossession. United protests this understanding, observing that "power of the court" is the caption of the Code's §105, 11 U.S.C. §105, and contending that the language "any

power of the court" thus must refer back to §105. Yet that would drain all meaning from the phrase "any power of the court" in §1110(a)(1), for the preceding language already blocks reliance on any other part of the Bankruptcy Code. Unless it is to be empty, the phrase "any power of the court" must deal with sources of law outside the Bankruptcy Code. It is not as if "power of the court" were a phrase limited to bankruptcy practice. It is generic language, logically read to mean exactly what it says: "*any* power of the court." This does not "repeal" the antitrust laws, as United would have it; instead, like the Anti-Injunction Act and the Norris-LaGuardia Act, it curtails a particular remedy without affecting any substantive rule. Section 1110(a)(1) leaves open the possibility of damages (not to mention actions by the FTC or criminal prosecutions by the United States); all it says is that courts can not prevent aircraft lessors or secured lenders from repossessing their collateral.

What is more, the antitrust claim is thin to the point of invisibility. United concedes that creditors are entitled to negotiate jointly in bankruptcy, as *Sharon Steel* holds. But it contends that the lessors have "colluded with one another with respect to the *future* terms and prices on which they would make aircraft available to United." (Emphasis in original.) If United means by this that would-be lessors are conspiring to set the price to be charged for new planes, then it has a good antitrust theory—but enjoining the repossession of old planes would not be a sensible means of vindicating the rule against cartelizing the sale of new planes. As best we can make out, however, what United means by "future terms and prices on which they … make aircraft available" is how much *less* than the contract price the lessors and lenders are willing to accept to forbear from repossessing planes now in United's hands.

Negotiating discounts on products *already* sold at competitive prices is not a form of monopolization. Negotiations on reductions to be taken in bankruptcy, when the buyer cannot pay all of its debts, are common and lawful, under the *Noerr-Pennington* doctrine if nothing else. True, the *Noerr-Pennington* doctrine cannot be used to shelter joint activity that creates monopoly prices independent of any decision by a court or agency. See *In re Brand Name Prescription Drugs Antitrust Litigation*, 186 F.3d 781, 789 (7th Cir. 1999). But collaboration among creditors to formulate a position about how much of a haircut to accept has no effect unless the

court approves the restructuring. By United's lights a prepackaged bankruptcy, in which all creditors negotiate to reach unanimous agreement before presenting a plan to a court, would be nothing but a colossal cartel, unlawful *per se*. What United really is complaining about is not the joint conduct of the lessors—which originally led to forbearance even though United stopped paying the agreed rentals—but the decision of some lenders to withdraw from that package deal and start acting on their own in order to get better prices from United (or, if that fails, lease the planes to someone else). That decision has the protection of both §1110(a)(1) and the *Noerr-Pennington* doctrine.

If an antitrust problem lurks in the post-bankruptcy dealings, United is as much an offender as the lessors are. The lenders want to shop the planes, selling future months of their remaining useful lives to the high bidders. United, by contrast, wants to limit these lessors to a single bidder (United itself) and deny them the benefit of competition, even though United is unwilling to pay the price agreed at the end of the competitive financing process, and even while United itself remains free to shop for better terms and return these 14 planes if it finds such terms. In other words, United fancies the position of monopsonist, which the antitrust laws forbid on equal terms with monopoly. See *Mandeville Island Farms, Inc. v. American Crystal Sugar Co.*, 334 U.S. 219 (1948).

The competitive solution is for *both* sides to have access to markets—and that outcome is achieved by allowing repossession. The lessors will get the current market price for airframes of the type and age involved. United, too, will enjoy a competitive price: it can buy or rent equivalent planes on going terms. If, as United and the Committee of Unsecured Creditors contend, the spot-market price is below not only the original rental terms but also the modified terms set when United filed for bankruptcy in 2002, then United will be better off as a result. Its problem arises if, as the lessors are betting, the price of used airplanes is higher than what United is now paying for these 14 aircraft. But if, as United contends, the highest and best use of these planes is with United, and the current competitive price is less than what United is paying in bankruptcy, then the threat to repossess is not credible, and United will keep the planes without judicial intervention (though tough bargaining may lie ahead to set the extent of the haircut from the old rental price).

Only if potential sellers and lenders conspire to set the price at which United can acquire *replacement* aircraft would there be a genuine antitrust problem, and United does not contend that such a cartel is in prospect.

With respect to equitable relief, the judgment of the district court is reversed, and the case is remanded with instructions to vacate the preliminary injunction and permit the repossessions to proceed unless United immediately cures its defaults and pays the full rentals under §1110(a)(2)(B)(iii). The mandate will issue today. With respect to the contempt citation, the petition for mandamus is denied.