**INDEPENDENCE PUBLIC MEDIA OF PHILADELPHIA, INC.**

**v.**

**PENNSYLVANIA PUBLIC TELEVISION NETWORK COMMISSION, et al.**

**Civ. A. No. 92–0109.**

United States District Court, E.D. Pennsylvania.

Nov. 18, 1992.

Eric B. Schnurer, Philadelphia, PA, for plaintiff.

Calvin R. Koons, Office of Atty. Gen., Harrisburg, PA, for defendants Pennsylvania Public Television Network Com'n, H. Sheldon Parker, Jr., Bart H. Cavanagh, Sr., Joseph D. Hughes, Richard A. Stafford, Helen B. Craig, Sheldon P. Siegel.

Christopher K. Walters, Thomas J. Marshall, Reed, Smith, Shaw & McClay, Philadelphia, PA, Robert A. Woods, Schwartz, Woods & Miller, Washington, DC, for de-

fendants, Public Broadcasting of North-west Pennsylvania, QED Communications, Inc., Lehigh Valley Telecommunications Corp., Northeastern Pennsylvania ETV Ass'n, Inc., WITF, Inc., Pennsylvania State University, WHYY, Inc.

## OPINION

PADOVA, District Judge.

Nine in-state public television stations currently serve the citizens of Pennsylvania.[1] Plaintiff Independence Public Media of Philadelphia, Inc. operates the infant of these nine, WYBE in Philadelphia, which began broadcasting in 1990.[2] In addition to being a newcomer, plaintiff considers WYBE to be unique among Pennsylvania public television stations in that it serves labor, low-income, women and minority groups rather than the "business and social elites" that plaintiff contends are most often the target of public television. Complaint at ¶¶ 84–89.

Plaintiff alleges that WYBE's eight Pennsylvania sister stations jealously share in a state-funded network known as the Pennsylvania Public Television Network ("PPTN"), which links the stations via microwave relay and produces statewide public television programming. The PPTN is a legislative creation operated by defendant Pennsylvania Public Television Network Commission ("PPTNC"), a commonwealth entity consisting of 22 commissioners, eight of whom are closely affiliated with the seven organizations that operate WYBE's sister stations.[3] (Seven commissioners are members of the governing boards of these organizations pursuant to statute. *See* 71 Pa.Stat.Ann. § 1188.2. Another PPTNC commissioner is a president and general manager of WLVT.) In addition to operating the PPTN, the PPTNC annually distributes approximately $6 million in state grants directly to seven of WYBE's eight sister stations.

Plaintiff avers that over the past four years, WYBE has unsuccessfully attempted to join the PPTN family and obtain its own share of the benefits of network membership, including microwave interconnection and funding. Plaintiff claims these attempts have been unlawfully blocked by its eight sister stations and spurned by the PPTNC. Consequently, invoking this Court's jurisdiction under 28 U.S.C. § 1331 to consider federal questions, plaintiff initiated this action against the PPTNC, the general manager of the PPTN,[4] the commissioners of the PPTNC[5] (the PPTNC, its general manager and the commissioner defendants will be referred to collectively as the "PPTN Defendants") and the seven organizations that operate WYBE's eight sister stations (collectively, the "TV Defendants"). Seeking compensatory, nominal, punitive, and treble damages as well as various forms of injunctive and declaratory relief, plaintiff makes several claims against these defendants that, for simplicity, I summarize under the following three headings:

1. The nine public television stations serving Pennsylvania are WQLN, Erie County; WQED and WQEX, Allegheny County; WLVT, Northampton County; WVIA, Luzerne County; WITF, Dauphin County; WPSX, Centre County; and WHYY and WYBE, Philadelphia County. There is some dispute as to whether WHYY is actually an in-state public television station, but the distinction does not bear upon the merits of this case.

2. Plaintiff will be referred to herein as "plaintiff" or "WYBE."

3. The following organizations operate WYBE's eight sister stations: Public Broadcasting of Northwest Pennsylvania, Inc. (WQLN); QED Communications, Inc. (WQED and WQEX); Le-high Valley Telecommunications Corporation (WLVT); Northeastern Pennsylvania ETV Association, Inc. (WVIA); WITF, Inc. (WITF); Pennsylvania State University (WPSX); WHYY, Inc. (WHYY).

4. Mr. H. Sheldon Parker, Jr.

5. WYBE has named the following individuals as defendant commissioners: Bart H. Cavanaugh, Sr.; Joseph D. Hughes; Richard A. Stafford; Helen B. Craig; Sheldon P. Siegel; Philip I. Berman; Patrick F. Toole; Albert C. Van Dusen; Louis I. Pollock; Roy C. Afflerbach; Peter C. Wambach; Paul W. Semmel; Myrna Delgado; Penelope M. Gerber; Charles D. Lemmond, Jr.; Douglas G. Lovell, Jr.; Enrico Serine; Raymond Bunt, Jr.; and Marlowe Froke.

(1) *Federal Constitutional Claims Asserted Under 42 U.S.C. § 1983* [6]

Plaintiff makes the following three claims under the United States Constitution:

(a) The Act that created the PPTNC, P.L. 1075, No. 329 (1968), 71 Pa.Stat.Ann. §§ 1188.1, *et seq.* (Purdon 1990) ("Act 329"), delegates legislative functions to the TV Defendants and infringes upon plaintiff's right to an unbiased decision maker in violation of plaintiff's right to due process of law under the Fifth and Fourteenth Amendments to the U.S. Constitution.

(b) Defendants refused to provide plaintiff with PPTN microwave interconnection and network funding based, in part, upon the content of WYBE's broadcasts, in violation of plaintiff's right to freedom of speech under the First and Fourteenth Amendments to the U.S. Constitution.

(c) Defendants refused to provide plaintiff with PPTN microwave interconnection and network funding on the same basis that interconnection and funding are provided to all other Pennsylvania public television stations, in violation of plaintiff's right to due process and equal protection of the laws under the Fifth and Fourteenth Amendments to the U.S. Constitution.

(2) *Antitrust Claims*

Plaintiff claims that the TV Defendants collaborated to divide, monopolize, and cartelize the Pennsylvania public television market, exclude a competitor, divide market territory, and refuse to deal, in violation of the Sherman and Clayton Acts, 15 U.S.C. §§ 1 *et seq.*, 12 et seq.

(3) *State Law Claims*

Plaintiff makes the following state law claims against the TV Defendants under this Court's authority to exercise supplemental jurisdiction, 28 U.S.C.A. § 1367 (West Supp.1992):

(a) The TV Defendants violated plaintiff's rights to due process of law, to liberty, to acquiring or possessing property, and to pursuing its own happiness under Article I, Section 1 of the Pennsylvania Constitution; to be free of discrimination under Article I, Section 26 of the Pennsylvania Constitution; and to freedom of speech under Article I, Section 7 of the Pennsylvania Constitution. Plaintiff also claims that the TV Defendants violated the prohibition under the Pennsylvania Constitution of the exercise of governmental authority by private parties.

(b) The TV Defendants have violated Act 329, which requires the PPTNC to interconnect WYBE via microwave with the PPTN and to provide WYBE with network funding.

Plaintiff has moved for partial summary judgment on its federal freedom of speech claim and the portion of its federal due process claim based upon the presence on the PPTNC of commissioners affiliated with the TV Defendants. All defendants have filed cross-motions for summary judgment as to each of plaintiff's claims.

## DISCUSSION

### I. SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Whether a fact is *material* will be determined by reference to the "substantive evidentiary standards that apply to the case." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Whether a *genuine* issue of material fact is presented will be determined by asking if "a reasonable jury could return a verdict for the non-moving party." *Id.*

**6.** Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983

Rule 56 requires opposition to a proper motion for summary judgment to be made by submission "of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Such evidence and all justifiable inferences that can be drawn from it are to be taken as true. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14. Such evidence need not be presented in a form admissible at trial. *Id.* My analysis of the motions of plaintiff and defendants will be guided by these standards.

## II. FEDERAL CONSTITUTIONAL CLAIMS

Plaintiff grounds its federal constitutional claims under 42 U.S.C. § 1983 upon the following three factual allegations: (1) that Act 329 delegates legislative authority to the TV Defendants, making the PPTNC biased against plaintiff; (2) that defendants have refused to interconnect WYBE via microwave with the PPTN; and (3) that defendants have refused to provide WYBE with PPTN funding. I will assess in turn plaintiff's claims as to each of these factual allegations.

### A. *Unlawful Delegation of Legislative Authority and Bias*

Plaintiff claims that the PPTNC has been unlawfully constituted insofar as Act 329 makes "a member from each of the governing boards of public television station licensees serving the Commonwealth" an ex officio member of the PPTNC. 71 Pa.Stat. Ann. § 1188.2.[7] Plaintiff alleges that this scheme for selecting 7 of the 22 PPTNC commissioners violates principles under the Fifth and Fourteenth Amendments prohibiting the delegation of governmental authority to private parties. (Plaintiff makes a similar claim under the Pennsylvania Constitution.) Plaintiff also claims that the

presence of these seven commissioners on the PPTNC, along with an eighth commissioner affiliated with the TV Defendants,[8] violates its rights under the Fifth and Fourteenth Amendments to an impartial governmental decision maker. Plaintiff asserts that it has been directly injured by the participation of these eight commissioners on the PPTNC because they effectively run the commission and are responsible in large part for the commission's denial of plaintiff's request for microwave interconnection and funding. Accordingly, plaintiff seeks partial summary judgment declaring this portion of Act 329 unconstitutional, enjoining these eight board members from further participation on the PPTNC, and enjoining the disbursal of public funds by the PPTNC pursuant to any decision that included these board members.

■ Defendants first respond that this Court should abstain from deciding these claims under *Railroad Comm'n v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). In this regard, defendants rely primarily upon *Reetz v. Bozanich,* 397 U.S. 82, 90 S.Ct. 788, 25 L.Ed.2d 68 (1970). In *Reetz,* the Court vacated the decision of a three-judge district court declaring certain Alaska fishing statutes invalid under both the federal and Alaska Constitutions. The Court held that the panel should have abstained under *Pullman* because a state court decision "could conceivably avoid any decision under the Fourteenth Amendment and would avoid any possible irritant in the federal-state relationship." 397 U.S. at 86–87, 90 S.Ct. at 790. Defendants contend that a state court decision in this case could likewise avoid both the federal constitutional questions presented and any possible irritation of the federal-state relationship.

*Reetz* and subsequent Supreme Court decisions explaining *Reetz,* however, have made clear that *Pullman* abstention is only

---

**7.** All parties agree that the public television station licensees referred to here are the TV Defendants.

**8.** The eighth PPTNC commissioner affiliated with the TV Defendants is the present Chairman of the Network Operations Committee, who

happens to be the President and General Manager of WLVT–TV, one of the TV Defendants. The Chairman of the Network Operations Committee is an ex officio member of the PPTNC. 71 Pa.Stat.Ann. § 1188.2.

appropriate when an *unsettled* question of state law underlies the federal constitutional question. *See Reetz,* 397 U.S. at 86, 90 S.Ct. at 790; *Zablocki v. Redhail,* 434 U.S. 374, 377–78 n. 5, 98 S.Ct. 673, 676–77 n. 5, 54 L.Ed.2d 618 (1978); *Fornaris v. Ridge Tool Co.,* 400 U.S. 41, 43, 91 S.Ct. 156, 157, 27 L.Ed.2d 174 (1970); *Wisconsin v. Constantineau,* 400 U.S. 433, 438, 91 S.Ct. 507, 510–11, 27 L.Ed.2d 515 (1971). The Court held in *Reetz,* for example, that the three-judge district court panel should have abstained because the Alaska fishing statute "might be so confined as not to have any constitutional infirmity." *Fornaris* 400 U.S. at 43, 91 S.Ct. at 157–58 (explaining *Reetz* ).⁹ But the same cannot be said for the portion of Act 329 challenged by plaintiff here—that seven seats on the PPTNC are to be filled by "a member from each of the seven governing boards of public television station licensees serving the Commonwealth." This language governing how PPTNC seats are to be filled is susceptible to only one possible interpretation: Seven of twenty-two members on the PPTNC are to be drawn from the governing boards of each of the TV Defendants. Plaintiff questions the constitutionality of this scheme, and defendants do not suggest, nor can I conceive of, any alternative glosses on Act 329 that might avoid plaintiff's challenge. Thus, unlike *Reetz,* there exists no unsettled question of state law for the courts of Pennsylvania to resolve. Accordingly, this Court cannot abstain from exercising its jurisdiction to adjudicate the constitutionality of this provision.

■ But this is not to say that plaintiff's *federal* constitutional claims must neces-

sarily be resolved. If the Pennsylvania Constitution provides " 'independent support' " for plaintiff's claims, then " 'there is no need for decision of the federal issue.' " *Carreras v. City of Anaheim,* 768 F.2d 1039, 1042 (9th Cir.1985) (quoting *City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 294–95, 102 S.Ct. 1070, 1077, 71 L.Ed.2d 152 (1982)). This rule follows from the long-standing reluctance of federal courts to decide federal constitutional questions when the case may be disposed of on other grounds. *See, e.g., Ashwander v. Tennessee Valley Auth.,* 297 U.S. 288, 345–48, 56 S.Ct. 466, 482–84, 80 L.Ed. 688 (1936) (Brandeis, J. concurring). As the Court of Appeals for the Ninth Circuit aptly pointed out in *Carreras,* "[t]he Supreme Court has indicated that federal constitutional issues should be avoided even when the alternative ground is one of state constitutional law." 768 F.2d at 1042–43. Applying this maxim here, I will consider first whether Act 329 conforms to the Pennsylvania Constitution, before reviewing it in light of the federal Constitution.

a. Pennsylvania Constitution

■ As a preliminary matter, I note that this Court has jurisdiction over plaintiff's claim against the TV Defendants under the Pennsylvania Constitution. In general, district courts have supplemental jurisdiction over "all other claims that are so related to claims in the action within ... [the courts'] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C.A. § 1367(a) (West Supp.1992).¹⁰ This Court's original jurisdiction was in-

---

**9.** . *Department of Social Serv. v. Dimery,* 398 U.S. 322, 90 S.Ct. 1871, 26 L.Ed.2d 265 (1970), also relied upon by defendants, is not to the contrary. In *Dimery,* the Court vacated *without opinion* and for reconsideration in light of *Reetz* a decision by a three-judge district court invalidating an Iowa welfare statute under the Iowa state constitution. *See Dimery v. Department of Social Serv.,* 320 F.Supp. 1125 (S.D.Iowa 1969). The panel had held the statute invalid under the Iowa Constitution for "undue delegation of legislative power to an administrative agency." *Id.* at 1130.

Defendants here assert that by vacating the panel's decision in light of *Reetz,* the Supreme

Court held, in effect, that federal courts must abstain from reviewing a state's delegation of legislative power until a state court has first passed upon the issue. This reads too much into the Supreme Court's Memorandum decision. The most that can be said of the Supreme Court's decision to vacate in light of *Reetz* is that the Court believed that the Iowa statute could be construed by an Iowa court to avoid any constitutional infirmity.

**10.** There are certain exceptions to this general rule that are not applicable at present. *See* 28 U.S.C.A. § 1367(b) and (c).

voked under 28 U.S.C. § 1331 to, *inter alia,* consider whether the commissioner appointment scheme of Act 329 violates the federal Constitution. Plaintiff's claim that this scheme also violates the Pennsylvania Constitution clearly forms part of the same case or controversy. Therefore, this Court may properly exercise jurisdiction over plaintiff's state constitutional claim.

Under Pennsylvania constitutional law, "the power to appoint persons to conduct governmental functions cannot be delegated to private organizations." *Hetherington v. McHale,* 458 Pa. 479, 329 A.2d 250, 251 (1974). In *McHale,* the Supreme Court of Pennsylvania declared unconstitutional a Pennsylvania statute that granted "to three private organizations absolute authority to designate a controlling number of the members of a Commonwealth committee responsible for the disbursement of substantial public funds [raised pursuant to the Pennsylvania Harness Racing Act]." *Id.* The court reasoned that a "fundamental precept" of the Pennsylvania Constitution "is that the people are to be governed only by their elected representatives." *Id.* 329 A.2d at 253. The scheme before the court violated this precept "by surrendering to private organizations the power to select eight of seventeen members of [the] commitee [sic]." *Id.*

This reasoning was followed and expanded by the same court two years later in *Commonwealth ex rel. Kane v. McKechnie,* 467 Pa. 430, 358 A.2d 419 (1976). There, the court considered a constitutional challenge to a statute providing that " 'The State Dental Council and Examining Board shall consist of the president of the Pennsylvania State Dental Society [and eight other members]....'" *Id.* 358 A.2d at 420 (quoting Administrative Code of 1929, Act of April 9, 1929, P.L. 177, art. IV, Sec. 414) (bracketed text in original). Among other things, the Dental Council and Examining Board ("Board") was responsible for investigating and approving dental schools, licensing dentists and hygienists and investigating and prosecuting those who commit illegal dental practices. *Id.* at 420. The Pennsylvania State Dental Society ("Society") was a private organization.

Citing *McHale,* the court held that this scheme for the appointment by the Society of *one* member of the nine member Board was in violation of the Pennsylvania rule against delegation of governmental functions to private organizations. In so doing, the court noted that this scheme was "actually worse than that present in [*McHale*]" because

> when the members of the Pennsylvania Dental Society elect their president, their motivation for casting a ballot in favor of a certain individual is most probably not prompted by a desire to select a person appropriately suited to serve as a member of the Board. Other motivations are certainly present. Indeed, the private interest of the members rather than the public interest is most probably the controlling consideration in the election of the president of this private group.

*Id.* 358 A.2d at 420–21. Continuing its comparison with *McHale,* the court also refused to accord any significance to the fact that only one member of nine on the Board was appointed by the Society, as opposed to eight of seventeen in *McHale:* "The one member in this case has a vote in the exercise of governmental functions, and one vote can without doubt significantly affect the decisions of the Board." *Id.* 358 A.2d at 421.

The seven members of the PPTNC who receive their appointments solely by virtue of having been elected to the governing boards of the TV Defendants likewise cast their votes on the PPTNC in the exercise of governmental functions,[11] and their seven votes can undoubtedly affect the decisions of the Commission.[12] Similar to the board

---

11. The PPTNC has been imbued, *inter alia,* with the power and duty to distribute state funds to Pennsylvania public television stations and establish, develop, and operate a state-funded public television network interconnecting such television stations. 71 Pa.Stat.Ann. § 1188.3.

12. This is born out by the PPTNC's attendance records. Between December 1974 and December 1991, the TV Defendant appointees constituted a majority of commissioners present at official meetings on a least 4 occasions, and on

in *McKechnie* and the commission in *McHale*, the selection of these seven commissioners is controlled solely by private parties—those who select individuals to the governing boards of the TV Defendants.[13] Also like *McKechnie*, this situation is "worse" than *McHale* because the choice of these commissioners is likely controlled more by private interests related to the selection of individuals best suited to governing the individual public television stations than the public interests of concern to the PPTNC, although the two may intersect on occasion.

Tellingly, the TV Defendants do not even attempt to distinguish Act 329 and the PPTNC from either *McHale* or *McKechnie*. Nor do I see a significant distinction. Accordingly, I find Act 329 to be in violation of the Pennsylvania Constitution to the extent that it allows private parties to appoint commissioners to the PPTNC.

■ Having so concluded, the next question to be addressed is the matter of a remedy. Avoiding federal Eleventh Amendment implications, plaintiff's claims under the Pennsylvania Constitution seek relief against only the TV Defendants.[14] But in its motion for partial summary judgment, plaintiff requests injunctive relief against not only the TV Defendants but the entire PPTNC and the current commissioners. Plaintiff admits in its motion that this Court cannot enter injunctive relief against these parties on its state claims for to do so would be to require state officials to conform their conduct to state law in violation of the Eleventh Amendment. Thus, the most that can be done in this regard is to enjoin the TV Defendants from further designating, choosing, selecting, or naming any representative to or member of the PPTNC. This would, perhaps, provide

plaintiff with prospective relief as the terms of these commissioners expire; but it would do nothing to remedy the situation in the near term. Therefore, because the relief this Court can provide under plaintiff's state constitutional claim would prove inadequate, I am compelled to consider plaintiff's claims under the federal constitution, which, if resolved in plaintiff's favor, may empower this Court to provide more complete relief.

### b. United States Constitution

Plaintiff makes essentially two claims regarding the membership of the PPTNC under the U.S. Constitution. First, plaintiff claims that the delegation to the TV Defendants of authority to appoint seven commissioners of the PPTNC violates the federal equivalent, under the Fifth and Fourteenth Amendments, of Pennsylvania's rule against such delegations. Second, plaintiff asserts that the eight PPTNC commissioners affiliated with the TV Defendants necessarily labor under a pecuniary conflict of interest when considering plaintiff's application for interconnection and funding. This conflict of interest, plaintiff contends, implicates plaintiff's right to an impartial decision maker, guaranteed by the Fifth and Fourteenth Amendments. Because I agree for the following reasons with plaintiff's later contention regarding the partiality of the PPTNC, which is dispositive of the issues here, I need not reach the question of whether an anti-delegation rule similar to Pennsylvania's can be found in the federal Constitution to apply to these circumstances.

■ I begin my consideration of plaintiff's claim of unconstitutional bias with the presumption that governmental decision makers are considered unbiased ab-

---

many occasions constituted a very substantial minority.

**13.** Assuming that the governing boards of the TV Defendants are constituted of more than one individual, there must be an additional step in the selection process by which someone or some group chooses the *one* board member from each of the boards who will become a PPTNC commissioner. This step removes the selection of a commissioner even further from the duly elect-

ed representatives of the citizens of Pennsylvania.

**14.** Under the Eleventh Amendment to the U.S. Constitution, this Court may not adjudicate claims that state officials have acted contrary to state law in carrying out their official responsibilities. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

sent a "showing of conflict of interest or some other specific reason for disqualification." *Schweiker v. McClure,* 456 U.S. 188, 195, 102 S.Ct. 1665, 1670, 72 L.Ed.2d 1 (1982) (footnote omitted). *See also Gibson v. Berryhill,* 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973). Plaintiff carries the burden of establishing a disqualifying interest. *See Schweiker,* 456 U.S. at 196, 102 S.Ct. at 1670.

Plaintiff likens the instant situation to that presented in *Gibson v. Berryhill,* 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488. There, the Alabama Board of Optometry (the "Board") intended to revoke the licenses to practice required of all optometrists employed by corporations, a group comprising about one-half of all the optometrists in the state. Members of the Board were drawn exclusively from an organization whose membership was limited to independent practitioners. The district court found that the independent practitioners in the state, including the Board members, would benefit substantially if the licenses of the corporate practitioners were revoked. This was viewed by the district court, *inter alia,* as a financial conflict of interest, disqualifying the Board members. The Supreme Court affirmed, holding that "those with substantial pecuniary interest in legal proceedings should not adjudicate these disputes." *Id.* at 579.

■ Plaintiff contends that in deciding its request for interconnection and funding, a PPTNC that includes the eight commissioners affiliated with the TV Defendants is not significantly different from the Board found to be unconstitutionally biased in *Gibson.* I agree. First, like the Board in *Gibson,* the PPTNC is a state agency adjudicating significant rights—the rights under Act 329 of a new station like WYBE to receive PPTN interconnection and funding.[15] The parties have stipulated in this regard that the PPTNC has rejected plaintiff's request for funding every year since 1989 and is currently considering plaintiff's request for interconnection. *See* Stipulation at ¶¶ 1–5. Thus, due process requires

PPTNC impartiality. *See, e.g., Schweiker,* 456 U.S. at 195, 102 S.Ct. at 1669–70 ("[D]ue process demands impartiality on the part of those who function in judicial or quasi-judicial capacities."); *Gibson,* 411 U.S. at 579, 93 S.Ct. at 1698 (applying this principle to administrative agencies).

■ Second, like the Board members in *Gibson,* the eight PPTNC commissioners affiliated with the TV Defendants have a substantial pecuniary interest in the outcome of the PPTNC's decision on plaintiff's request. There is no dispute among the parties that if the PPTNC provides funding to plaintiff, each of the TV Defendants will receive fewer funds from the PPTNC as a consequence. *See, e.g.,* Affidavit of Sheldon P. Siegel at ¶ 15 (expressing concern that division of declining state appropriations between eight or nine stations rather than seven would effectively reduce the amount of funds provided to the TV Defendants). Likewise, to the extent that PPTN funds that might otherwise go to the TV Defendants are expended, the same can be said with regard to interconnecting WYBE via microwave to the PPTN. *See* Unsworn Declaration of Ronald Lask, Director of Operations for the PPTN (estimating that interconnecting WYBE will cost the PPTN between $998,190 and $2,673,131). These undisputed facts suggest strongly that the TV Defendants have a significant financial interest in opposing plaintiff's request for interconnection and funding.

This same interest must be imputed to the eight PPTNC commissioners affiliated with the TV Defendants. Pursuant to Act 329, seven of these individuals are members of the governing boards of the TV Defendants. As board members of corporations, these individuals maintain a fiduciary relationship with their corporations that includes, *inter alia,* a duty of loyalty. *See Enterra Corp. v. SGS Associates,* 600 F.Supp. 678, 684 (E.D.Pa.1985). As fiduciaries of the TV Defendants, these seven commissioners are naturally inclined and may consider themselves duty-bound to act in the best interest of their corporations

---

**15.** By referring to funding and interconnection as "rights," I do not mean to suggest in any way

that plaintiff is or is not entitled to interconnection or funding under Act 329.

with regard to such matters as corporate funding. *Cf. United Retail & Wholesale Employees Teamsters Union Local No. 115 Pension Plan v. Yahn & McDonnell, Inc.,* 787 F.2d 128, 138 (3d Cir.1986), *aff'd per curiam by an equally divided Court sub nom., Pension Benefit Guarantee Corp. v. Yahn & McDonnell,* 481 U.S. 735, 107 S.Ct. 2171, 95 L.Ed.2d 692 (1987) (performing similar due process bias analysis and noting the natural conflict that trustees of a pension plan appointed by participating employers and employees may have as fiduciaries in assessing the liability of employers who withdraw funds from the plan). Plaintiff's request of these seven commissioners for PPTN interconnection and funding conflicts directly with this interest, for to grant plaintiff's request would be to reduce the amount of funds that are provided to the commissioners' respective stations.

Although submitted in rebuttal by the TV Defendants, the sworn affidavit of Mr. Sheldon P. Siegel poignantly illustrates the effect that this conflict has actually had on the decision making of at least one PPTNC commissioner. Mr. Siegel serves as a PPTNC commissioner by virtue of his position as Chairman of the PPTNC's Network Operations Committee. *See* 71 Pa.Stat. Ann. § 1188.2. In addition to being a PPTNC commissioner, Mr. Siegel is also the President and General Manager of WLVT–TV, a Pennsylvania public television station operated by one of the TV Defendants. As a PPTNC commissioner and an officer of one of the TV Defendants, Mr. Siegel's situation is virtually identical to that of the seven board member/commissioners.

In his affidavit, Mr. Siegel states that as a PPTNC commissioner, he actively opposed and voted against funding plaintiff. *See* Affidavit of Sheldon P. Siegel at ¶ 20. He offers the following explanation for doing so:

> ... a fundamental concern I had in addressing the requests of WYBE and WQEX [16] was that Pennsylvania *not fur-*

*ther reduce its already diminished support for the seven strategically-located and interconnected member stations....* For years, state grants to Pennsylvania public television stations from PPTNC have been divided among these seven original stations. The level of state appropriations for PPTNC's operations and member stations has, however, declined significantly since 1989. While such appropriations totaled about $10.0 million in FY 1990–1991, they declined to about $8.0 million the next year (a drop of 20%), and have remained close to the latter figure thereafter. Only about $6.0 million of the current year's appropriations to PPTNC are for grants to the stations. *I am concerned that to divide such grants between eight or nine or more stations, rather than seven,* would erode the quality of public television in the Commonwealth in a significant way. *While I acknowledge that this concern is one which can be perceived as benefiting our own station, WLVT, the concern is based on a great deal more than just that element of self-interest.* It is based upon my fundamental public interest concern that dilution of the support of the basic seven stations will undermine the quality of public broadcasting in Pennsylvania.

Affidavit of Sheldon P. Siegel at ¶ 15 (emphasis added). Plainly, and perhaps understandably, Commissioner Siegel had more on his mind in considering plaintiff's request than just the best interests of the public. He was also concerned with the negative financial implications that granting plaintiff's request may have had on his television station, and he apparently concedes that his vote against and opposition to plaintiff's request was based, in at least small part, upon this element of financial self-interest. By his own words, then, Commissioner Siegel describes a financial conflict of interest that has biased him against granting plaintiff's request. Although the seven other commissioners appointed by the TV Defendants are corporate board members rather than corporate

---

16. WQEX is a Pittsburgh public television station that has made requests similar to plaintiff's

for funding and interconnection, but is not a plaintiff in this lawsuit.

officers, it is not too much to conclude that they are similarly biased.

When the PPTNC sits down to consider plaintiff's request, the presence of these eight financially biased commissioners presents precisely the type of situation prohibited by the U.S. Supreme Court in *Gibson* as a violation of due process. That only eight of twenty-two commissioners may be so biased changes nothing in my view. I am greatly persuaded in this regard by the reasoning of the Supreme Court of Pennsylvania in *McKechnie* that even one vote of many in the exercise of government functions can "without doubt significantly affect the decisions ... [made]." *McKechnie*, 358 A.2d at 421.

In sum, I conclude that plaintiff has carried its burden of demonstrating the presence of a disqualifying conflict of interest among the eight PPTNC commissioners affiliated with the TV Defendants. I also conclude that defendants have failed to demonstrate the presence of a genuine issue of fact from which a reasonable jury could conclude otherwise. *See Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553. Accordingly, I find that the involvement on the PPTNC of the eight commissioners affiliated with the TV Defendants in considering plaintiff's request for funding and interconnection violates plaintiff's right to an impartial decision maker guaranteed by federal constitutional principles of due process. I will therefore grant in part plaintiff's motion for partial summary judgment as to this claim and enter an order enjoining these eight individuals from further participation on the PPTNC in such decisions.[17] I will also declare invalid the PPTNC's decision denying plaintiff's request for network funding, said decision

being the product of an unconstitutionally biased governmental body.

██ I will not, however, enter an order at this time, as plaintiff requests, enjoining the PPTNC commissioners from disbursing funds pursuant to any decision of the PPTNC in which these commissioners participated. An order of this nature may have the severe consequence of financially strangling the PPTNC and the PPTN, and is not to be entered lightly. The record as presently developed does not identify the specific funds that plaintiff targets, how they have been disbursed to this point in time, where they have been designated, or where they should properly be directed. Most importantly, plaintiff has not indicated how it will be harmed if such an order is not entered.

Finally, as mentioned above, because my findings in this regard effectively dispose of this aspect of plaintiff's due process claims to the extent that this Court is now authorized to provide plaintiff with the equitable relief to which it is entitled, I need not reach the issue of whether the federal constitution contains an applicable rule against delegations of governmental authority similar to Pennsylvania's.[18]

### B. *Network Interconnection*

Plaintiff next claims that defendants' refusal to interconnect WYBE via microwave with the PPTN violates its First Amendment right of free speech because the PPTNC's decision to deny interconnection was based, in part, upon a standard adopted by the PPTNC requiring WYBE to demonstrate that at least 75 percent of its programming does not duplicate programming already offered by its Philadelphia sister station, WHYY. *See* Brief in Sup-

**17.** Plaintiff seeks injunctive relief against these individual commissioners under 42 U.S.C. § 1983. I note that state officials are subject to injunctive relief under this statute if sued in either their individual or official capacities. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 65 & n. 10, 109 S.Ct. 2304, 2308–09 & n. 10, 105 L.Ed.2d 45 (1989). Although plaintiff does not so state expressly in its complaint, plaintiff appears to be suing the individual commissioners in their official capacity only. Plaintiff lists each commissioner in its complaint as "a com-

missioner of defendant PPTN," and plaintiff does not appear to be seeking damages from the commissioners individually. *See Melo v. Hafer*, 912 F.2d 628, 636 & n. 7 (3d Cir.1990).

**18.** I also decline to reach this question of federal constitutional law because I previously decided essentially the same question in plaintiff's favor on an alternate state ground. *See Carreras*, 768 F.2d at 1042–43.

port of Plaintiff's Motion for Partial Summary Judgment on "Free Speech" Claims ("WYBE's Free Speech Brief") at 4. Plaintiff also claims that defendants' refusal to interconnect WYBE violates its rights to due process and equal protection of the laws under the Fifth and Fourteenth Amendments because the decision to reject plaintiff's request was made by a biased governmental decision maker, and plaintiff has been arbitrarily treated differently than its eight sister stations.[19]

Defendants contend that these claims are not ripe for adjudication by this Court because the PPTNC has not made a decision on whether to interconnect WYBE with the PPTN.[20] Indeed, the parties have stipulated that such a decision has not been made and that only recently has WYBE submitted its request for interconnection in the form required by the PPTNC procedure designed to evaluate such requests.[21] *See* Stipulation at ¶ 5. And other than to suggest that the 75 percent non-duplication standard is final, plaintiff offers no argument supporting the ripeness of these claims. *See* Plaintiff's Brief In Opposition to Defendants' Motions for Summary Judgment ("Plaintiff's Brief in Opposition") at 51.

■ "Application of the ripeness doctrine prevents the entanglement of the courts in administrative policy disagreements and protects the agencies from judicial interference until decisions are formal-

ized and their effects felt in a concrete way. Awaiting the termination of agency proceedings may obviate the need for judicial review." *CEC Energy Co. v. Public Serv. Comm'n*, 891 F.2d 1107, 1109 (3d Cir.1989) (citation omitted). To determine whether an issue is ripe for judicial review, this Court must assess the following two factors: (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration. *See Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 201, 103 S.Ct. 1713, 1720–21, 75 L.Ed.2d 752 (1983).

■ When the actions of government agencies are challenged, the fitness of an issue for judicial decision turns on whether the agency's action is final. *See CEC Energy*, 891 F.2d at 1110. Five factors are to be taken into consideration in determining the finality of agency action:

1) whether the decision represents the agency's definitive position on the question; 2) whether the decision has the status of law with the expectation of immediate compliance; 3) whether the decision has immediate impact on the day-to-day operations of the party seeking review; 4) whether the decision involves a pure question of law that does not require further factual development; and 5) whether immediate judicial review would speed enforcement of the relevant act.

**19.** Plaintiff's bias claim in this context must be kept distinct from its claim of bias addressed above. Plaintiff's earlier claim of bias challenged the *make-up* of the PPTNC as a governmental adjudicator. Plaintiff's instant claim of bias challenges, on grounds of fundamental fairness, a *decision* made by the PPTNC. The central contention of the instant claim is that the TV Defendants exerted undue influence over the PPTNC's decision making process.

**20.** This argument was initially put forth by the PPTN Defendants, *see* Brief of the Pennsylvania Public Television Network Commission and Defendant Commissioners in Opposition to Plaintiff's Motions for Summary Judgment at 6, and incorporated by reference by the TV Defendants. *See* Memorandum of Law of the Public Television Station Defendants to the Motion of Plaintiff for Partial Summary Judgment on its First Amendment Claims at 3 n. 2; Memoran-

dum of Law of the Public Television Station Defendants to the Motion of Plaintiff for Partial Summary Judgment on Delegation Claims at 3 n. 1.

**21.** According to the Unsworn Declaration of Rosalyn K. Robinson, Deputy General Counsel to the Governor of Pennsylvania, this procedure involves preliminary consideration of WYBE's request for interconnection by an ad hoc credentials committee of the PPTNC, which will make a recommendation to the full PPTNC. If the ensuing recommendation is adverse to WYBE, it can file objections that will be considered by an independent hearing examiner who will take testimony, prepare a record, and make an additional recommendation to the PPTNC. Based upon these two recommendations, the PPTNC will then make a final decision on interconnection.

*Id.* Viewing the PPTNC's actions with regard to plaintiff's request for interconnection in light of these factors demonstrates that these actions are far from final.

As stipulated, the PPTNC has certainly not expressed its definitive position on WYBE interconnection; plaintiff has only recently submitted its application in the form required by the PPTNC. Nor is the so-called 75 percent non-duplication standard definitive of the PPTNC's position, because, as plaintiff itself admits, "no-one at PPTN has ever defined what constitutes program duplication." *See* WYBE's Free Speech Brief at 5. Accordingly, there can be no argument that anything the PPTNC has done with respect to interconnection has the status of law with an immediate expectation of compliance. As there has been no decision on interconnection, and the non-duplication standard appears ambiguous, WYBE's day-to-day operations go untouched, and there is no argument from plaintiff to the contrary. Further, because I must wait to see how the non-duplication standard will be applied and whether WYBE will be interconnected before I can determine whether federal rights were infringed, the issue to be decided will require a great deal of additional factual development.

A final consideration is whether immediate judicial review would speed enforcement of Act 329. Plaintiff's position that Act 329 *requires* interconnection arguably could merit immediate review to ensure that the Act's purpose is not frustrated. However, judicial interference in the PPTNC's process at this time would be disruptive, postpone a final determination that could obviate the need for judicial review, and be inimical to the legislative scheme.

The second factor to be addressed in assessing the ripeness of a claim for judicial review is the hardship to the parties of withholding judicial consideration. I conclude that by withholding judicial consideration of plaintiff's federal constitutional claims regarding interconnection, plaintiff will suffer no hardship that would necessitate review at this time. The hardship sustained by withholding judicial review may be assessed by determining whether plaintiff has "demonstrated concrete injury, either actual or impending." *Hallandale Professional Fire Fighters Local 2238 v. City of Hallandale, R.J.,* 922 F.2d 756, 760–61 (11th Cir.1991). *See also Laird v. Tatum,* 408 U.S. 1, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972) (requiring that plaintiffs demonstrate actual or impending injury in first amendment context). As the PPTNC has made no decision on interconnection adverse to plaintiff, no actual injury has been incurred. Nor has plaintiff demonstrated the presence of impending injury: Plaintiff itself admits that under all but the most restrictive and questionable definitions of the PPTNC's non-duplication standard (none of which, plaintiff also admits, have been formally adopted by the PPTNC), WYBE would likely qualify as non-duplicative. *See* WYBE's Free Speech Brief at 6, 7 n. 2. Hence any threatened injury is speculative at best. Without actual or impending injury, plaintiff will suffer no hardship whatsoever by withholding judicial consideration of its claims. Defendants, of course, in raising the issue of ripeness, do not see themselves as suffering any hardship either.

Having concluded that plaintiff's federal constitutional claims regarding interconnection are not fit for judicial decision and that the parties will suffer no hardship by delaying judicial consideration, I find that these claims do not present a justiciable case or controversy. Accordingly, these claims will be dismissed without prejudice for lack of jurisdiction.[22]

## C. *Network Funding*

Plaintiff's final claims under the U.S. Constitution are that defendants have denied it PPTN funding in violation of its rights of free speech, due process and equal protection. Plaintiff's free speech

---

**22.** Had I jurisdiction to consider these claims, I would nonetheless abstain from adjudicating them. *See infra* note 24.

claim in the funding context is based upon the same allegations that color its free speech claim regarding interconnection— that defendants have denied plaintiff PPTN funding based, in part, upon the 75 percent non-duplication standard. Similarly, plaintiff's due process and equal protection claims rest upon the same allegations supporting these claims in the interconnection context—the decision to reject plaintiff's request for funding was made by a biased governmental decision maker, and plaintiff has been arbitrarily treated differently than its eight sister stations.[23]

■ The parties having stipulated that the PPTNC rejected plaintiff's request for funding, defendants do not contest the justiciability of these claims. Instead, as in the case of plaintiff's "delegation" and bias claims above, defendants contend that this Court should abstain under *Pullman* from exercising its jurisdiction. Although I did not agree with defendants' suggestion of abstention earlier, I agree with it here.

As a general rule, federal courts are bound to adjudicate cases within their jurisdiction. *See Hughes v. Lipscher,* 906 F.2d 961, 964 (3d Cir.1990). But in cases "where questions under both state law and the federal constitution are present, the policies of promoting comity with the state courts and ensuring the smooth functioning of the federal judiciary counsel the federal courts to stay their hands, at least initially." *Hughes,* 906 F.2d at 964. The Court of Appeals for the Third Circuit requires the presence of the following three "special circumstances" before courts of this Circuit may abstain under *Pullman:*

First, there must be uncertain issues of state law underlying the federal constitutional claims brought in the federal court. Second, these state law issues must be amenable to an interpretation by the state courts that would obviate the need for or substantially narrow the scope of the adjudication of the constitutional claims. And third, it must appear that an erroneous decision of state law

by the federal court would by disruptive of important state policies.

*D'Iorio v. County of Delaware,* 592 F.2d 681, 686 (3d Cir.1978), *overruled on other grounds, Kershner v. Mazurkiewicz,* 670 F.2d 440, 448 (3d Cir.1982) (en banc). When these special circumstances are present, the courts of this Circuit must next consider whether various equitable factors such as the availability of an adequate state remedy, the length of time the litigation has been pending, and the potential impact on the parties of delay militate against abstention. *See Hughes,* 906 F.2d at 964.

Turning to the instant case, I find first that uncertain issues of state law underlie plaintiff's federal constitutional claims regarding funding. Plaintiff's state law claims in this case include a charge that section 3 of Act 329 *requires* the PPTNC to provide plaintiff with network funding:

The *powers* and *duties* of the [PPTNC] shall include, but not be limited to, the following:

(1) To assist, develop and support a statewide policy to encourage the growth and development of a dynamic, free and effective public television service;

(2) To make *grants* to public television stations serving Pennsylvania to aid in the improvement of their broadcast operations, programming, and capital facilities;

(3) To establish and develop and operate, on behalf of the Commonwealth, a public television network system interconnecting *all* noncommercial television stations serving Pennsylvania;

(4) To insure the diversity of programming to allow for freedom, imagination, objectivity and initiative on both the State and local level....

71 Pa.Stat.Ann. § 1188.3 (emphasis added). If correct in its reading of this statute, plaintiff would be entitled to funding as a matter of state law, obviating the need to consider whether the federal Constitution independently requires funding. The rub, however, is between discretionary "pow-

---

**23.** Again, I note that plaintiff's bias claim in this context must be kept distinct from its bias claim

regarding the make-up of the PPTNC. *See* note 19, *supra.*

ers" and mandatory "duties," and the PPTNC views funding as a matter of discretion. Since the courts of Pennsylvania have provided no guidance on this point whatsoever, an uncertain issue of state law underlies plaintiff's federal constitutional claim, and the first "special circumstance" for abstention is present.

The second special circumstance is also present. As alluded to already, a state court interpretation of Act 329 requiring the PPTNC to provide plaintiff with funding would entirely eliminate plaintiff's free speech, due process, and equal protection claims. Such a decision by a state court, moreover, is entirely plausible from a plain reading of the statute.

Likewise, the third special circumstance for abstention is present here: An erroneous decision by this Court regarding WYBE funding would undoubtedly have disruptive effects upon Pennsylvania's policies. The Pennsylvania legislature has invested a commission of 22 members from various professions and occupations with vast authority to manage public television within the commonwealth. 71 Pa.Stat.Ann. §§ 1188.2, 1188.3. The legislature identified the public policy behind the creation of the PPTNC as one of encouraging and developing the "growth of educational television broadcasting, including the use of such media for instructional purposes." 71 Pa.Stat.Ann. § 1188.1. Significantly, the legislature had in mind an independent commission that would "facilitate the development of educational television broadcasting and ... afford *maximum protection from extraneous interference and control.*" 71 Pa.Stat.Ann. § 1188.1 (emphasis added).

An erroneous decision by this Court would result in just the sort of extraneous interference in Pennsylvania public television sought to be avoided by the legislature. Public television is obviously of vital importance to the citizens of Pennsylvania. So important, in fact, that the Pennsylvania legislature has funded a public television network and has directly funded individual public television stations. An inaccurate prediction of whether the legislature intended funding for stations like WYBE could undermine the entire scheme of funding educational television in Pennsylvania. The immediate implication of a decision requiring funding for WYBE would be the disbursement of already limited monies to an additional station, reducing the allotment each original station currently receives. *See* Affidavit of Sheldon P. Siegel at ¶ 15. On the other hand, a decision not to require funding for stations like WYBE might severely hamper the legislature's goal of fostering growth and diversity in public television. In addition, the effectiveness and authority of the PPTNC itself risks being undermined in either case. And the negative impacts would not be limited just to WYBE, its sister stations, or the PPTNC, but would inure to the detriment of those around the commonwealth who rely upon public television both for its entertainment and educational values. These concerns assuredly counsel in favor of restraint and seal plaintiff's federal constitutional claims regarding funding as a paradigm for *Pullman* abstention.

Having found that plaintiff's federal constitutional claims regarding funding present the threshold circumstances required for abstention, I turn to whether equitable considerations weigh against abstention. No party disputes the availability of adequate judicial review of plaintiff's claims by the Pennsylvania Courts. The Commonwealth Court of Pennsylvania has exclusive jurisdiction over appeals from final orders of most commonwealth agencies, and would likely have jurisdiction over the PPTNC's funding decision and interpretation of Act 329. *See* 42 Pa.Cons.Stat.Ann. § 763 (Purdon 1981). Moreover, I must assume that the courts of Pennsylvania are capable of and will consider the PPTNC's actions and Act 329 in light of federal as well as state constitutional principles. *See Trone v. Preate*, 770 F.Supp. 994, 1003–04 (M.D.Pa.1991).

Next, the duration of this litigation has not been long. The complaint was filed in January 1992, some ten months ago. The instant motions for summary judgment were not filed until five months later, in May. At the request of the parties, the

Court withheld consideration of these motions for nearly two months pending settlement negotiations regarding, *inter alia,* the possibility of state court review of plaintiff's claims. After informing the Court that settlement was not possible, the Court scheduled the motions for oral argument and undertook to address them as soon as possible in light of competing docket demands. Thus, I conclude that this case has not been pending an inordinate amount of time and has been addressed as expeditiously as possible under the circumstances.

Nor do I believe that the delay necessary to allow the state courts to speak will cause significant adverse impact to the parties. Defendants, of course, will be protected by the status quo, the PPTN Defendants in particular benefiting from the temporary vindication of their authority to control state funding of public television. Plaintiff, on the other hand, would like to pocket the funds to which it believes it is entitled sooner rather than later. This desire, however, is just that. There is no evidence that plaintiff cannot operate WYBE without PPTN funding. In fact, plaintiff's own assertions are to the contrary, for WYBE been around since 1982, has been broadcasting since 1990, has raised nearly $1 million in private funds, and has "begun to receive federal funding [and] additional private funding." Complaint at ¶¶ 50–60. Additionally, I note that in its earlier-filed Motion for a Preliminary Injunction, which was dismissed without prejudice by the Honorable Louis C. Bechtle, Chief Judge of this Court, plaintiff did not contend that immediate funding was in any way vital to its existence. This is simply not a case, as identified by the Third Circuit in *Hughes,* where "delay would deprive disabled children of educational opportunities or prevent individuals from marrying." 906 F.2d at 966–67 (citations omitted).

In sum, I find that plaintiff's federal constitutional claims regarding PPTN funding present the special circumstances and equitable considerations warranting abstention under *Pullman.* I will therefore abstain from adjudicating these claims but retain jurisdiction over them pending authoritative decision by the court of Pennsylvania.[24]

### D. *Liability Under 42 U.S.C. § 1983*

The final issue to be addressed with regard to plaintiff's federal constitutional claims is the TV Defendants' contention that they cannot be liable under 42 U.S.C. § 1983 for any alleged violation of plaintiff's constitutional rights. Acknowledged by plaintiff to be private entities, the TV Defendants will be liable to plaintiff under section 1983 only if plaintiff proves, first, that they deprived plaintiff of its federal constitutional rights and, second, that they were acting under color of state law in doing so. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 1604, 26 L.Ed.2d 142 (1970).

As identified earlier, plaintiff alleges that the following three actions of all defendants violated its rights under the U.S. Constitution: (1) Act 329 unlawfully delegates legislative authority to the TV Defendants, creating a commission biased against plaintiff; (2) defendants refused to interconnect WYBE via microwave with the PPTN; and (3) defendants refused to provide WYBE with PPTN funding. I will assess the TV Defendants' liability under section 1983 as to each of these factual allegations.

Taking plaintiff's claims regarding interconnection first, I note that the TV defendants cannot possibly be liable to plaintiff under section 1983 because I have dismissed these claims for lack of jurisdiction. ■ Turning next to plaintiff's claims regarding the delegation of governmental

---

24. This analysis applies equally to plaintiff's federal constitutional claims regarding interconnection. Act 329 can be read to *require* network interconnection. *See* 71 Pa.Stat.Ann. § 1188.-3(3). Thus there exists an unsettled question of state law that may be resolved in such a way that plaintiff's federal constitutional claims regarding interconnection would be obviated. Accordingly, for the reasons given here, I would abstain from reaching plaintiff's federal claims regarding interconnection had I jurisdiction over them.

authority to the TV Defendants and PPTNC bias, the issue, of course, is whether the private *TV Defendants* caused an infringement upon plaintiff's rights. *See Adickes,* 398 U.S. at 150, 90 S.Ct. at 1604. I conclude that they have not. The make-up of the PPTNC, including provision for membership on the PPTNC of the eight commissioners affiliated with the TV Defendants, was designed by the Pennsylvania legislature in the late 1960s. *See* 71 Pa.Stat.Ann. § 1188.2. Thus plaintiff's complaints regarding the constituency of the commission are against the Pennsylvania legislature, not the TV Defendants. Plaintiff makes no assertion nor offers any evidence to suggest that the TV Defendants conspired in the late 1960s with the legislature to develop this scheme and deprive plaintiff of its rights. *See Adickes,* 398 U.S. at 152, 90 S.Ct. at 1605. (private party can be held liable under section 1983 if involved in a conspiracy with state officials to violate plaintiff's constitutional rights). Therefore, I conclude that the TV Defendants cannot be liable to plaintiff under section 1983 on its "delegation" and bias claims regarding the make-up of the commission, and I will grant judgment in their favor.

Finally, I consider whether the TV Defendants can be held liable to plaintiff for any infringement upon its constitutional rights resulting from the PPTNC's refusal to provide plaintiff with PPTN funding.[25] All parties acknowledge that the decision not to fund plaintiff was officially the PPTNC's, not the TV Defendants'. Plaintiff contends, however, that the TV Defendants share with the PPTNC and the individual commissioners any section 1983 liability that may result from this decision because the TV Defendants conspired with the commissioners to reach this decision, making the TV Defendants state actors. In their motion for summary judgment, the TV Defendants argue that plaintiff has presented no evidence of such a conspiracy.

On a motion for summary judgment, the moving party must demonstrate that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Whether a fact is "material" is determined by reference to the substantive evidentiary standards that apply to the case. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. at 2510. Here, the presence of a conspiracy or understanding between the private TV Defendants and the PPTNC commissioners to deny plaintiff funding is a predicate to finding liability under section 1983, and, therefore, very "material." *See Adickes,* 398 U.S. at 152, 90 S.Ct. at 1605. Whether a "genuine" issue of material fact exists is determined by asking whether there is sufficient evidence of the material fact so that a reasonable jury could find for the non-moving party. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Thus the ultimate question here is whether the TV Defendants have carried their burden of demonstrating that there is no evidence with which a reasonable jury could find that the TV Defendants and the commissioners came to some understanding or conspired to deny plaintiff PPTN funding. I conclude that the TV Defendants have failed.

I observed earlier that a determination not to fund plaintiff has already been made by the PPTNC and that at least one PPTNC commissioner, Sheldon Siegel, acknowledged by affidavit that a concern for the financial well-being of his station played a part in his decision to vote against funding WYBE. In addition to acknowledging the presence of this concern in his vote, Mr. Siegel also states in his affidavit that this concern, among others, caused him "to try to persuade other PPTNC commissioners to ... [oppose funding WYBE]." *See* Affidavit of Sheldon P. Siegel at ¶ 20. In other words, the president and general manager of TV Defendant WLVT, motivated in part by concerns for the financial welfare of his station, went

---

**25.** Although I decided earlier to abstain from reaching plaintiff's claims regarding funding, I must nonetheless consider the TV Defendants' liability under section 1983 should it be determined at some future time that plaintiff's rights in this regard were, in fact, violated. This is particularly so because I will retain jurisdiction over these claims.

about trying to persuade his colleagues to vote against funding WYBE. Appearing in the TV Defendants' own submission in support of their motion for summary judgment, this statement does just the opposite of demonstrating the absence of a genuine issue of material fact. *See Adickes* 398 U.S. at 157, 90 S.Ct. at 1608 (material submitted by moving party must be viewed in light most favorable to non-moving party). Placed in context with the undisputed fact that the PPTNC ultimately denied plaintiff's request for funding, this statement may be sufficient in itself for a reasonable jury to infer that at least WLVT acted in concert with the PPTNC commissioners to deny plaintiff funding. *Cf. Monell v. Department of Social Serv.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978) (Although municipal corporation cannot be liable under section 1983 solely under theory of *respondeat superior* for acts of its employees, injury caused by execution of municipal corporations's policy or custom as expressed by those whose acts "may fairly be said to represent official policy" may be attributable to corporation for purposes of section 1983.)

Mr. Siegel also states in his affidavit that "WYBE's requests ... resulted in efforts by *the seven member stations,* the Commission, its counsel and staff, to refine policies to deal with such requests." Affidavit of Sheldon P. Siegel at ¶ 10 (emphasis added). Again, viewed in the light most favorable to plaintiff, this statement simply highlights genuine issues of material fact, rather than negating them. If, as the TV Defendants contend, they have had nothing to do with the PPTNC's decisions on funding WYBE, then why were they part of the effort, along with the PPTNC's counsel and staff, to "refine" the *PPTNC's* policies on dealing with WYBE's request? Mr. Siegel's statement suggests just the sort of

cozy relationship between the PPTNC and the TV Defendants that plaintiff contends makes the TV Defendants state actors under *Adickes.* At a minimum, there is credible evidence that the TV Defendants have taken part in refining official PPTNC policies regarding plaintiff's funding request. And since the PPTNC ultimately denied plaintiff's request, a reasonable jury could infer that these same policies or their progeny resulted in the rejection of that request. *See Adickes* 398 U.S. at 158–59, 90 S.Ct. at 1608–09 (inferences to be drawn from moving party's materials must be viewed in light most favorable to non-moving party).

I therefore conclude that the TV Defendants failed to carry their burden of demonstrating the absence of a genuine issue of material fact with regard to plaintiff's charge that they conspired with the PPTNC to deny plaintiff funding. Accordingly, the TV Defendants' motion as to this claim will be denied.[26]

### III. ANTITRUST CLAIMS

Plaintiff seeks to parlay its allegations of a conspiracy among the defendants in deprivation of its constitutional rights into a claim that the TV Defendants have conspired in violation of the federal antitrust laws. The TV Defendants respond, *inter alia,* that even if this were true, they are nonetheless immune from antitrust liability under what has come to be known as the *Noerr–Pennington* doctrine, named after the Supreme Court's decisions in *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and *United Mine Workers v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). These decisions set forth the Court's understanding that "the federal antitrust laws ... do not regulate the conduct of private individ-

---

**26.** I note that even if the TV Defendants had carried their burden, plaintiff submitted sufficient evidence in rebuttal to nonetheless deny their motion. For example, plaintiff submitted the affidavit of Timothy W. Potts, a PPTNC commissioner from 1987 to 1990 representing the Pennsylvania Secretary of Education. Mr. Potts states that in numerous conversations he had with the PPTNC commissioners affiliated

with the TV Defendants, they expressed their "concern that providing any form of recognition to ... WYBE would result in less funding for their own station." This formed the express basis for their opposition to ... [plaintiff]. Affidavit of Timothy W. Potts at ¶ 5. This statement suggests that the TV Defendants and the PPTNC may have indeed acted jointly to deny plaintiff's request.

uals in seeking anticompetitive action from the government," *City of Columbia v. Omni Outdoor Advertising,* — U.S. —, —, 111 S.Ct. 1344, 1354, 113 L.Ed.2d 382 (1991), a notion based upon the "recognition that the antitrust laws, 'tailored as they are for the business world, are not at all appropriate for application in the political arena.'" *Id.* (quoting *Noerr,* 365 U.S. at 141, 81 S.Ct. at 619).

The TV Defendants contend that they are protected under the *Noerr–Pennington* doctrine because plaintiff's antitrust claims are based solely upon allegations that the TV Defendants conspired to influence the PPTNC, a governmental agency, to deny plaintiff's request for interconnection and funding. Plaintiff does not contest the applicability, as a general matter, of the *Noerr–Pennington* doctrine to this case, but seeks refuge in the so-called "sham" exception to the doctrine. *See* Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment ("Plaintiff's Brief in Opposition") at 82–88. The "sham" exception "encompasses situations in which persons use the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon. A classic example is the filing of frivolous objections to the license application of a competitor, with no expectation of achieving denial of the license but simply in order to impose expense and delay." *Omni,* — U.S. at —, 111 S.Ct. at 1354 (emphasis in original).

The TV Defendants argue that this case does not fit into the "sham" exception, and analogize this situation to the one before the Supreme Court in *Omni.* There, a billboard company in Columbia, South Carolina that had 95% of the billboard business in that city was alleged to have conspired with city officials in violation of the antitrust laws by enacting zoning ordinances that would restrict billboard construction by a competitor. *Omni,* — U.S. at —, 111 S.Ct. at 1347. After a trial, the jury found for the competitor, specifically finding that the defendant billboard company had conspired with the defendant city officials. The trial judge granted the defendants' motion for judgment notwithstand-

ing the verdict, and the Court of Appeals for the Fourth Circuit reversed, reinstating the jury verdict and applying the "sham" exception. The Supreme Court reversed.

With regard to the "sham" exception, the Court of Appeals based its decision upon two theories, both of which were rejected by the Supreme Court. First, the Court of Appeals reasoned that the jury could have concluded that the conspiracy was "'nothing more than an attempt to interfere directly with the business relations [sic] of a competitor.'" *Id.* — U.S. at — at 1354 (quoting 891 F.2d 1127, 1139 (quoting *Noerr,* 365 U.S. at 144, 81 S.Ct. at 621)). The Supreme Court disagreed: "Although [the defendant billboard company] indisputably set out to disrupt [the competitor's] business, it sought to do so not through the very process of lobbying, or of causing the city council to consider zoning measures, but rather through the ultimate *product* of the lobbying and consideration, viz., the zoning ordinances." *Id.* (emphasis in original).

The second theory relied upon by the Court of Appeals was that the jury could have found that the defendant billboard company's purposes "'were to delay [the competitor's] entry into the market and even to deny it a meaningful access to the appropriate city administrative and legislative fora.'" *Id.* (quoting 891 F.2d at 1139). Rejecting this ground, the Court stated that "the purpose of delaying a competitor's entry into the market does not render lobbying activity a 'sham,' unless (as no evidence suggested was true here) the delay is sought to be achieved only by the lobbying process itself, and not by governmental action that the lobbying seeks." *Id.*

Moving for summary judgment here, the TV Defendants contend that plaintiff's allegations, if true, would demonstrate that the TV Defendants conspired to influence the PPTNC to actually take a position adverse to plaintiff, as did the defendant billboard company in *Omni,* not to delay the PPTNC and harm plaintiff through the lobbying process itself. They also assert that there is no evidence otherwise. On a motion for summary judgment, the TV Defen-

dants carry the initial burden of demonstrating the lack of a genuine issue of material fact and that they are entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c). That the alleged conspiracy among the TV Defendants was an effort to obtain a favorable result from the PPTNC rather than an attempt to harm plaintiff through abuse of the PPTNC's procedures is *the* material fact upon which turns the TV Defendants' *Noerr–Pennington* defense. For the following reasons, I conclude that the TV Defendants have carried their burden of demonstrating no genuine issue as to this fact and that they are entitled to judgment as a matter of law.

■ First, the entire theory of plaintiff's complaint is that the PPTNC rejected plaintiff's request as a result of a conspiracy among the TV Defendants and the PPTNC. Hence, plaintiff complains of the *outcome* of the TV Defendants' acts (a PPTNC decision rejecting plaintiff's request) not the *process.* Plaintiff does not allege that the TV Defendants filed frivolous objections to plaintiff's request. Nor does plaintiff allege that the TV Defendants were not interested in receiving a favorable outcome from the PPTNC—an allegation inimical to the remainder of plaintiff's case. Thus plaintiff itself pleads a cause that does not fall within the "sham" exception.

■ Second, the evidence suggests that if there was a conspiracy among the TV Defendants and the PPTNC to deny plaintiff's request, it was successful and thus genuine. Since filing their briefs, the parties stipulated that the PPTNC actually rejected plaintiff's request for funding. The apparent success of the TV Defendants in bringing about such a decision intimates strongly that, if plaintiff's allegations are true, the TV Defendants' were

engaged in a sincere effort to influence the PPTNC, rather than some sham effort to use the PPTNC process as an anticompetitive weapon.[27] *See Federal Prescription Serv., Inc. v. American Pharmaceutical Ass'n,* 663 F.2d 253, 265, (D.C.Cir.1981), *cert. denied,* 455 U.S. 928, 102 S.Ct. 1293, 71 L.Ed.2d 472 (1982) ("*Noerr* holds the antitrust laws are not intended to regulate genuine efforts to secure governmental action. That [defendant's] efforts were genuine is manifested by their success.").[28]

Having met their burden of demonstrating that no genuine issue exists as to this crucial fact, the TV Defendants cause the burden to shift to plaintiff to demonstrate by the submission of Rule 56(c) materials other than the pleadings that a reasonable jury could find otherwise. *See Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. at 2553. In attempting to meet this burden, plaintiff offers materials that purportedly reveal a strategy among the TV Defendants to achieve a *de facto* denial of plaintiff's request by "frustrating and delaying WYBE's receipt of state assistance indefinitely." Plaintiff's Brief In Opposition at 87. After reviewing plaintiff's submissions, however, I conclude that these materials do not support such an assertion and that plaintiff has not met its burden.

Plaintiff relies heavily upon the affidavit of former PPTNC commissioner Timothy W. Potts. Mr. Potts states, *inter alia,* that

> [i]t is my observation and belief from my service on the PPTNC that the majority of Commission members and staff, led by various of the seven older [Pennsylvania public television stations], determined from the outset to deny any and all of [plaintiff's] requests for participation and assistance. The events of the ensuing two and one-half years were designed simply to string [plaintiff] along without

---

**27.** That the PPTNC has not acted on plaintiff's request for interconnection does not detract from this analysis. As mentioned above, plaintiff has only recently submitted its application for interconnection in the required form. *See supra* at p. 428.

**28.** Plaintiff essentially concedes the force of this analysis in its brief: "Either the stations acted

> successfully to secure PPTNC rejection of WYBE's application—in which case they are liable under [plaintiff's] equal protection claim . . .—or they did *not,* in which case we are well on our way to establishing the sort of delay in 'licensure' (or, as here, interconnection) . . . [referred to] as quintessential 'sham' activities." Plaintiff's Brief In Opposition at 85–86 (emphasis in original).

ever actually acting upon its entreaties....

Affidavit of Timothy W. Potts at ¶ 17. At first glance, this statement suggests that perhaps plaintiff is correct: Perhaps abuse of process and delay rest at the heart of the alleged conspiracy among the TV Defendants and the PPTNC. Closer examination, however, washes away any such suggestion.

Mr. Potts states that the defendants made a decision "from the outset to deny any and all of [plaintiff's] requests." This, of course, belies plaintiff's entire argument. "A 'sham' situation involves a defendant whose activities are not genuinely aimed at procuring favorable government action at all, not one who genuinely seeks to achieve his governmental result, but does so *through improper means.*" *Omni,* —— U.S. at ——, 111 S.Ct. at 1354 (citations and quotations omitted) (emphasis in original). Here, plaintiff's own affiant identifies the desired governmental result (PPTNC denial of plaintiff's request) and states that it was nearly accomplished from the outset, formal execution being all that remained. Thus there can be no serious contention that the lobbying process was used as a sham not genuinely aimed at favorable government action. If plaintiff's affiant is to be believed, there would have been very little, if any, opportunity for the TV Defendants to engage in a strategy designed to abuse the lobbying process, as a favorable internal decision had been made early.

The only delay identified by Mr. Potts was in formally executing this internal decision. But this delay does not convert the TV Defendant's alleged activities into a sham regulated by the antitrust laws. For delay intended to harm a competitor to fall within the "sham" exception, it must have been "sought to be achieved only by the lobbying process itself, and not by the governmental action that the lobbying seeks."

*Omni,* —— U.S. at ——, 111 S.Ct. at 1354. Plaintiff's remaining submissions indicate that the delay identified by Mr. Potts and complained of by plaintiff was attributable to PPTNC (and, perhaps, TV Defendant) efforts to develop a formal policy to handle plaintiff's request, which was the first of its kind before the PPTNC.[29] And plaintiff stipulates that the PPTNC subsequently rejected plaintiff's request for funding and devised a procedure for considering plaintiff's request for interconnection. Thus plaintiff's own submissions and stipulations demonstrate that any alleged delay was simply part of the TV Defendants alleged efforts to procure a formal rejection of plaintiff's request, not efforts to stage a delay and harm plaintiff through the lobbying process itself.

In summary, I find that plaintiff has failed to carry its burden of offering evidence from which a reasonable jury could find that the alleged conspiracy among the TV Defendants to influence the PPTNC was a sham designed to cause delay in itself rather than achieve favorable governmental action. Plaintiff's own affiant extinguishes this possibility, as does the fact that plaintiff's request for funding was ultimately rejected and that a formal procedure for consideration of plaintiff's request for interconnection has been developed and made available to plaintiff. The TV Defendants are therefore entitled to protection under the *Noerr–Pennington* doctrine, and I will accordingly grant the their motion for summary judgment as to plaintiff's antitrust claims.

## IV. STATE LAW CLAIMS

As noted above, plaintiff makes various claims against the TV Defendants under the Pennsylvania Constitution and Act 329. I have already decided in plaintiff's favor its claim that the Pennsylvania Constitution prohibits Act 329's delegation to the TV Defendants of authority to appoint PPTNC

---

**29.** Plaintiff's submissions demonstrate that the PPTNC set out to create these policies by employing special PPTNC committees to study the request and develop procedures, standards and recommendations. As these policies were developed, plaintiff was required to continually submit additional information about itself to the PPTNC. Plaintiff's submissions also suggest that the TV Defendants attempted to influence the development of these policies and may have contributed to the time consumed by the PPTNC in defining their contours.

commissioners. And by abstaining from reviewing plaintiff's federal constitutional claims regarding funding, I perforce choose not to resolve questions under Act 329. This leaves plaintiff's remaining claims against the TV Defendants under the Pennsylvania Constitution. Although the TV Defendants have moved for summary judgment on all claims, they have not presented the court with reasons why judgment should be entered in their favor on these claims. Therefore, I will allow these claims to proceed to trial and deny the TV Defendant's motion accordingly.

An appropriate order follows.

## ORDER

AND NOW, this 16th day of November, 1992, upon consideration of (a) Plaintiff's Motion for Partial Summary Judgment on "Delegation" Claims (Docket No. 20); (b) Plaintiff's Motion for Summary Judgment on "Free Speech" Claims (Docket No. 25); (c) Motion for Summary Judgment By the Public Television Station Defendants (Docket No. 23); and (d) Motion for Summary Judgment of Defendants Pennsylvania Public Television Network Commission and Individual Commissioners (Docket No. 24); and all documents filed in support thereof and in response thereto, and after oral argument at which all parties participated,

IT IS HEREBY ORDERED, for the reasons stated in the accompanying Opinion, that:

(1) Plaintiff's Motion for Partial Summary Judgment on "Delegation" Claims is GRANTED IN PART AND DENIED IN PART as follows:

(a) JUDGMENT is entered in FAVOR OF Plaintiff as to plaintiff's claim of unlawful delegation of legislative authority under the Pennsylvania Constitution.

*Declaratory and Injunctive Relief*

(i) Section 2 of P.L. 1075, No. 329, Nov. 20, 1968 ("Act 329"), 71 Pa.Stat.Ann. § 1188.2, is INVALID under the Pennsylvania Constitution TO THE EXTENT THAT it makes members from each of the seven governing boards of public television station licensees serving the Commonwealth mentioned in Act 329 ex officio members of the Pennsylvania Public Television Network Commission ("PPTNC").

(ii) The TV Defendants are ENJOINED from appointing, designating or sending representatives of their governing boards to be ex officio members of the PPTNC.

(b) JUDGMENT is entered in FAVOR OF PLAINTIFF as to plaintiff's claim that the PPTNC, as presently constituted, is biased in violation of the Fifth and Fourteenth Amendments to the United States Constitution.

*Declaratory and Injunctive Relief*

(i) The decision of the PPTNC denying plaintiff's request for network funding is hereby declared invalid, having been made by an unconstitutionally biased governmental body.

(ii) All present ex officio members of the PPTNC appointed by the TV Defendants pursuant to Act 329 are ENJOINED from participation on the PPTNC in any consideration of plaintiff's request to the PPTNC for funding or network interconnection.

(iii) PPTNC Commissioner Sheldon P. Siegel is ENJOINED from participation on the PPTNC in any consideration of plaintiff's request to the PPTNC for funding or network interconnection.

(c) In all other respects, said motion is DENIED.

(2) Plaintiff's Motion for Partial Summary Judgment on "Free Speech" Claims is DENIED.

(3) The Motion for Partial Summary Judgment by the Television Station Defendants is GRANTED IN PART AND DENIED IN PART as follows:

(a) JUDGMENT is entered in FAVOR of the TV Defendants and AGAINST plaintiff as to plaintiff's federal claims, asserted under 42 U.S.C. § 1983, regarding the delegation of governmental authority to the TV Defendants and plaintiffs' claim that the PPTNC, as presently constituted, is biased in violation of the Fifth and Fourteenth

Amendments to the United States Constitution.

(b) JUDGMENT is entered in FAVOR of the TV Defendants and AGAINST Plaintiff as to plaintiff's federal antitrust claims.

(c) In all other respects, said motion is DENIED.

(4) The Motion for Summary Judgment of Defendants Pennsylvania Public Television Network Commission and Individual Commissioners is GRANTED IN PART AND DENIED IN PART as follows:

(a) Plaintiff's federal constitutional claims regarding microwave interconnection with the Pennsylvania Public Television Network are DISMISSED as to ALL defendants as NONJUSTICIABLE.

(b) Plaintiff's federal constitutional claims regarding funding are PLACED IN SUSPENSE pending further order of this Court.

(c) In all other respects, said motion is DENIED.